# Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products

[The following memorandum, prepared for the President for transmission to Congress in accordance with the direction in § 3 of the Energy Emergency Preparedness Act of 1982, describes in comprehensive fashion the authorities available to the President under existing statutes to respond to a severe energy supply shortage or interruption. It sets forth the legal basis for certain specific emergency preparedness activities, discusses the scope of each available emergency authority, and analyzes the differing threshold standards for activation of the President's authority under each of the statutes involved.]

November 15, 1982

## TABLE OF CONTENTS

TABLE OF CONTENTS
GLOSSARY OF ABBREVIATIONS
INTRODUCTION
  I. STATUTORY AUTHORITIES
    A. Energy Policy and Conservation Act
      1. § 103. Limitations on Exports
      2. § 106. Accelerated Production Rates
      3. §§ 151–161. Strategic Petroleum Reserve
        a. Establishment of the SPR
        b. Filling the SPR
        c. Drawdown and Distribution of the SPR
      4. §§ 201–202. Energy Conservation Contingency Plans
      5. §§ 251, 252, 254. Authorities in Support of the Allocation and Information Provisions of the IEP
        a. § 251. International Allocation
        b. § 252. Antitrust Defense
        c. § 254. Exchange of Information with the International Energy Agency

644

B. Defense Production Act of 1950
   1. § 101(a). Priority Performance of Contracts and Allocation of Materials
   2. § 101(c). Maximizing Domestic Energy Supplies
   3. § 708. Voluntary Agreements
   4. § 710. Employment of Persons from the Private Sector
      a. Circumstances Governing Use of Employees
      b. Conflict-of-Interest and Antitrust Restrictions
         1) Conflict-of-Interest Restrictions
         2) Antitrust Exposure
C. Trade Expansion Act of 1962
D. International Emergency Economic Powers Act
E. Emergency Energy Conservation Act of 1979
F. Export Administration Act of 1979
G. Other Statutory Authorities
   1. Fuel Switching Authorities
   2. Miscellaneous Statutes
II. LEGAL BASES FOR SPECIFIED ENERGY PREPAREDNESS ACTIVITIES
A. Authority to Implement the IEP
   1. Obligations Imposed by the IEP Agreement
      a. Emergency Reserves (Chapter I)
      b. Demand Restraint (Chapter II)
      c. Oil Sharing (Chapter III)
      d. Information Exchange (Chapter V)
   2. Activation of the IEP Emergency System
   3. Statutory Authority to Implement the IEP Agreement
      a. Emergency Reserves
      b. Demand Restraint Measures
      c. Oil Sharing
      d. Information Exchange
   4. December 10, 1981, Decision of the Governing Board with Respect to Subcrisis Activities
   5. National Emergency Sharing Organization
   6. Emergency Sharing System
   7. Supply Rights Project
B. Authority to Fulfill NATO Obligations
C. Authority with Respect to Development and Use of the SPR
D. Authority for Government Incentives to Encourage Private Petroleum Product Stocks
E. Authority for Reactivation of the Executive Reserve
F. Authority for Coordination with State and Local Governments
   1. Preemption of State Laws and Regulations
   2. Burden on Interstate Commerce
G. Authority for Public Information Activities

III. TRIGGERS FOR EXERCISE OF STATUTORY AUTHORITIES
   A. Situations Involving War, International Tensions That Threaten National Security, and Other Presidentially Declared Emergencies
   B. Events Resulting in Activation of the International Energy Program
   C. Less Severe Events or Situations
IV. CONCLUSION

# GLOSSARY OF ABBREVIATIONS

DPA    Defense Production Act of 1950

EAA    Export Administration Act of 1979

EECA    Emergency Energy Conservation Act of 1979

EEPA    Energy Emergency Preparedness Act of 1982

EPAA    Emergency Petroleum Allocation Act of 1975

EPCA    Energy Policy and Conservation Act

ESA    Energy Security Act

FEMA    Federal Emergency Management Agency

FERC    Federal Energy Regulatory Commission

FPA    Federal Power Act

FPM    Federal Personnel Manual

FTC    Federal Trade Commission

FUA    Powerplant and Industrial Fuel Use Act of 1978

IEA    International Energy Agency

IEEPA    International Emergency Economic Powers Act

IEP    International Energy Program

IPR    Industrial Petroleum Reserve

Mer    Maximum efficient rate of production

MLLA    Mineral Lands Leasing Act

NATO    North Atlantic Treaty Organization

NEA    National Emergencies Act

NESO    National Emergency Sharing Organization

NGA    Natural Gas Act

NGPA    Natural Gas Policy Act

NPRs    Naval Petroleum Reserves

OCS    Outer Continental Shelf

PURPA    Public Utility Regulatory Policies Act of 1978

SPR    Strategic Petroleum Reserve

TEA    Trade Expansion Act of 1962

Ter    Temporary emergency production rate

TWEA    Trading with the Enemy Act

WOCs    Without Compensation Employees

## MEMORANDUM OF LAW

### Introduction

This memorandum is submitted in response to § 3 of the Energy Emergency Preparedness Act of 1982 (EEPA), Pub. L. No. 97–229, 96 Stat. 248 (1982). That section amends Title II of the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201–6422 (1982), by adding, *inter alia*, a new § 272(a). Section 272(a) directs the Attorney General, in consultation with the Secretary of Energy, to prepare for transmission by the President to Congress a "Memorandum of Law" describing the "nature and extent of the authorities available to the President under existing law to respond to a severe energy supply interruption or other substantial reduction in the amount of petroleum products available in the United States."[1] Section 272(a) provides that the Memorandum of Law shall address the legal bases for certain specific emergency preparedness activities to deal with a petroleum shortage,[2] and to distinguish among the threshold standards for activation of the President's statutory authorities.[3]

---

[1] This Memorandum was prepared by the Office of Legal Counsel of the Department of Justice, at the direction of and under the supervision of the Attorney General, in consultation with the Department of Energy Assistance was also provided by the Antitrust Division and Land and Natural Resources Division of the Department of Justice, the Department of Defense, the Department of State, and the Federal Emergency Management Agency

[2] Section 272(a)(3)(A) specifies that the Memorandum include the following subjects:

    (i) activities of the United States in support of the international energy program and the December 10, 1981, International Energy Agency agreement entitled 'Decision on Preparation for Future Supply Disruptions' including—

        (I) the National Emergency Sharing Organization,

        (II) emergency sharing systems; and

        (III) the supply right project;

    (ii) activities of the United States pursuant to its energy emergency preparedness obligations to the North Atlantic Treaty Organization;

    (in) development and use of the Strategic Petroleum Reserve;

    (iv) Government incentives to encourage private petroleum product stocks,

    (v) reactivation of the following Executive Manpower Reserves.

        (I) the Emergency Electric Power Reserve,

        (II) the Emergency Petroleum and Gas Reserve; and

        (III) the Emergency Solid Fuels Reserve,

    (vi) energy emergency response management in coordination with State and local governments; and

    (vn) emergency public information activities, . . .

[3] Section 272(a)(3)(B) provides that the Memorandum should distinguish among—

    (i) situations involving limited or general war, international tensions that threaten national security, and other Presidentially declared emergencies,

    (ii) events resulting in activation of the international energy program; and

    (iii) events or situations less severe than those described in clauses (i) and (ii).

In order to implement fully the intent of the EEPA, we have prepared the following analysis of the primary statutory authorities that would be available to the President in the event of a severe energy supply interruption. In addition to describing the requirements, scope, and limitations of those statutory authorities, we attempt to address each of the legal issues specifically raised by Congress during consideration of the EEPA and the legal bases for the activities enumerated in § 272(a)(3). Consistent with the scope and legislative intent of the EEPA,[4] the analysis focuses on statutory authorities that could be used to respond to a "petroleum emergency"—*i.e.*, standby authorities that could be exercised in the event of a sudden substantial reduction in petroleum products available to the United States.[5] We generally do not address the President's broad authority to take actions to reduce the likelihood that any of these "emergency" authorities will ever have to be exercised, or particular statutory authorities with respect to energy emergencies resulting from a shortfall in energy sources other than petroleum.

It is important to recognize at the outset that any memorandum of law discussing the powers of the President in the context of nonexistent, necessarily incomplete, and hypothetical facts is of limited utility and should not be regarded as decisive or exhaustive of the President's legal authority to take any specific action based on a factual situation that may arise in the future. The exercise of the various broad powers of the President to deal with "emergencies" is so often tied to the particular facts and circumstances confronting the President at that time that a general and hypothetical discussion of his authority should not and cannot be viewed as dispositive of his authority in actual emergencies.[6] *See generally Dames & Moore* v. *Regan,* 453 U.S. 654, 660–62, 669 (1981).

Finally, the purpose of this Memorandum is limited to outlining the nature and scope of the statutory authorities available to the President. The Memorandum does not address whether or how the President should exercise particular authorities. That question is primarily a policy rather than a legal matter, and therefore outside the scope of this Memorandum. In that regard, it should be noted that, as described more fully below, the available statutory authorities generally provide the President with broad discretion to determine if, when, and how they should be exercised, taking into account the facts of any future energy emergency and the President's best judgment as to how to prevent or deal with the emergency situation.

Part I of this Memorandum outlines the scope and applicability of existing statutory authorities available to the President to deal with a petroleum emergency. Part II describes how those statutory authorities may support or limit the

---

[4] *See* S Rep No. 393, 97th Cong , 2d Sess 4–5 (1982); H.R. Rep. No 585, 97th Cong., 2d Sess 1–2 (1982)

[5] We use the term "petroleum" or "petroleum products" in this Memorandum to include those energy sources that are included in the definition of "petroleum products" in § 3(3) of the Energy Policy and Conservation Act, 42 U.S.C. § 6202(3), *i e.,* "crude oil, residual fuel oil, or any refined petroleum product (including any natural [gas] liquid and any natural gas liquid product)."

[6] For that reason, we cannot attempt here to discuss whatever inherent constitutional powers the President may have, in the absence of specific statutory authority, to deal with a future petroleum emergency *See generally Youngstown Sheet & Tube Co.* v *Sawyer,* 343 U.S 579, 637 (1952) (Jackson, J., concurring). The existence or scope of such inherent powers can only be addressed in the context of a particular emergency situation.

particular energy preparedness activities enumerated in § 272(a)(3)(A). Part III groups the statutory authorities according to the three triggering situations listed in § 272(a)(3)(B), to the extent consistent with the specific provisions of those statutes.

## I. Statutory Authorities

A number of statutes currently provide the President with authority that may be available in the event of a substantial domestic or international shortfall in petroleum supplies, ranging from direct authority to allocate and to restrict imports or exports of petroleum products, to authority to undertake or facilitate energy emergency preparedness planning and programs. The scope of the President's authority under these statutes necessarily depends on the particular facts presented by any future petroleum shortage, and therefore it is difficult, if not impossible, to resolve in the abstract all of the legal issues concerning the nature and extent of that authority. In particular, to the extent that the President's authority under certain statutes rests on a discretionary presidential finding, for example, that an emergency situation exists or that actions are necessary and appropriate "in the national interest," to promote the "national defense," or to fulfill international obligations of the United States, it is impossible to determine in the absence of specific facts when exercise of that authority would be consistent with the terms of the statute. This Memorandum therefore can only attempt to outline the terms of the statutes and describe generally the authority and any limitations on that authority contained in those statutes as written.

Among these authorities, the Energy Policy and Conservation Act,[7] the Defense Production Act of 1950,[8] and the Trade Expansion Act of 1962[9] provide the President, in a petroleum emergency meeting the requirements of those statutes, with some specific authority to affect or control the distribution of petroleum products, as well as other authority to mitigate or plan for such an emergency. Additional authority that may be available to the President, depending on the circumstances of any petroleum emergency, is contained in the International Emergency Economic Powers Act,[10] the Emergency Energy Conservation Act of 1979,[11] the Export Administration Act of 1979,[12] and in numerous miscellaneous statutes such as the Public Utility Regulatory Policies Act of 1978,[13] the Powerplant and Industrial Fuel Use Act of 1978,[14] the Federal Power Act,[15] the Natural Gas Act,[16] the National Gas Policy Act,[17] the Mineral Lands

---

[7] 42 U.S.C. §§ 6201–6422, *as amended by* Pub. L. No. 97–229, 96 Stat 248 (1982).

[8] 50 U S.C. app §§ 2061–2169 (1982).

[9] 19 U.S.C. §§ 1801–1982 (1982).

[10] 50 U.S.C. §§ 1701–1706 (1982)

[11] 42 U.S.C §§ 8501–8541 (1982).

[12] 50 U.S.C. app §§ 2401–2420 (1982).

[13] Pub. L No. 95–617, 92 Stat. 3119 (1978), *codified in* 16 U.S.C §§ 2601–2645 (1982) & 15 U.S.C § 717z (1982).

[14] 42 U.S.C. §§ 8301–8484 (1982)

[15] 16 U.S.C. §§ 791a–825r (1982).

[16] 15 U.S C. §§ 717–717z (1982).

[17] 15 U.S.C. §§ 3301–3432 (1982)

650

Leasing Act,[18] the Outer Continental Shelf Lands Act,[19] the Clean Air Act,[20] the Interstate Commerce Act,[21] the Disaster Relief Act of 1974,[22] the Magnuson Act,[23] and the Foreign Assistance Act of 1961.[24]

## A. Energy Policy and Conservation Act

The Energy Policy and Conservation Act (EPCA), 42 U.S.C. §§ 6201–6422 (1982), provides the President with discretionary authority to respond to an actual or potential shortfall in domestic or international petroleum supplies, including the power to: restrict exports of energy supplies; require accelerated production of crude oil or natural gas from designated fields; establish and use a Strategic Petroleum Reserve; direct the preparation and implementation of energy conservation contingency plans; and take actions necessary to implement certain international obligations of the United States.[25]

With the exception of export restrictions promulgated under § 103,[26] the President's authority under the EPCA is generally contingent on a finding that the actions taken are necessary to meet a "severe energy supply interruption" or to fulfill "obligations of the United States under the international energy program" (IEP).[27] A "severe energy supply interruption" is defined by § 3(8) of the Act, 42 U.S.C. § 6202(8), as a national energy supply shortage which the President determines—

(A) is, or is likely to be, of significant scope and duration, and of an emergency nature;

(B) may cause major adverse impact on national safety or the national economy; and

(C) results, or is likely to result, from an interruption in the supply of imported petroleum products, or from sabotage or an act of God.

The IEP, established in 1974 by the Agreement on an International Energy Program (Agreement), to which the United States is a signatory, provides for coordinated action among the 21 members (Participating Countries) in order to decrease their vulnerability to supply disruptions and dependence on imported

---

[18] 30 U S C. §§ 181–287 (1982).

[19] 43 U.S.C. §§ 1331–1356 (1982).

[20] 42 U.S.C §§ 7401–7642 (1982).

[21] 49 U.S.C. §§ 10101 et seq (1982).

[22] 42 U.S C. §§ 5121–5202 (1982)

[23] 50 U S C. §§ 191 et seq (1982).

[24] Pub. L No 87–195, 75 Stat 424 (1961), as amended, codified in scattered sections of 7, 22, and 42 U.S.C.

[25] The EPCA also extended the crude oil and petroleum product pricing authority of the Emergency Petroleum Allocation Act of 1975 (EPAA), 15 U.S C §§ 751–760h (1982), established price controls on previously exempt domestic crude oil; established maximum weighted average first sale prices on all domestic crude oil, and directed the President to develop a rationing contingency plan Those provisions of the EPCA expired with the EPAA on September 30, 1981. In addition, § 104 of the EPCA amended § 101 of the Defense Production Act of 1950, 50 U S C app. § 2071, adding a new subsection (c) that authorizes the President to require the allocation of supplies of materials and equipment in order to maximize domestic energy supplies That provision is discussed infra

[26] 42 U.S C. § 6212 See discussion infra.

[27] See 42 U.S C §§ 6214(a)(2)(B), 6214(b)(2), 6214(c), 6261(b), 6271(a), 6272(b)

oil.[28] The Agreement imposes four principal substantive obligations: (1) the maintenance of emergency oil reserves (Chapter I); (2) a program of contingent demand restraint measures (Chapter II); (3) a program of international sharing of oil supplies during a supply emergency (Chapter III); and (4) the establishment of an information system on the international oil market (Chapter V). A critical feature of the IEP is the agreement on a "trigger" level of shortage in petroleum supplies that may activate certain emergency measures to ease disruption caused by the shortage. This emergency system may be activated only in the event of a 7 percent or greater shortfall in oil supplies of one or all of the Participating Countries, as determined in accordance with procedures set out in Chapter IV of the Agreement. Once the emergency system has been activated, all Participating Countries are obligated to share in the shortfall. This may include, depending on the circumstances, the sharing of oil supplies among Participating Countries, based on a calculation of "supply rights" that assumes a certain amount of the shortfall will be absorbed through demand restraint and use of emergency reserves.[29]

## 1. Section 103. Limitations on Exports

Section 103 of the EPCA, 42 U.S.C. § 6212, grants the President certain authority to limit exports of energy supplies, including petroleum products. Subsection (a), 42 U.S.C. § 6212(a), provides the President with discretionary authority to promulgate a rule restricting exports of coal, petroleum products, natural gas, or petrochemical feedstocks, and related materials and equipment. To facilitate implementation of any rule issued pursuant to subsection (a), the President may require the Secretary of Commerce to implement export restrictions pursuant to procedures established by the Export Administration Act of 1979 (EAA), 50 U.S.C. app. §§ 2401–2420 (1982). *See* 42 U.S.C. § 6212(c). The Secretary of Commerce may implement those restrictions without regard to the direction in the EAA that export controls be limited to those necessary, *inter alia*, "to reduce the serious inflationary impact of foreign demand."[30] Subsection (b), 42 U.S.C. § 6212(b), requires the President to promulgate a rule prohibiting the export of crude oil and natural gas produced in the United States. The President may exempt crude oil or natural gas exports from that prohibition only

---

[28] Section 3(7) of the EPCA, 42 U.S C. § 6202(7), defines the IEP as follows

The term "international energy program" means the Agreement on an International Energy Program, signed by the United States on November 18, 1974, including (A) the annex entitled "Emergency Reserves," (B) any amendment to such Agreement which includes another nation as a party to such Agreement, and (C) any technical or clerical amendment to such Agreement

The effect of this definition is to limit the use of the authority provided by the EPCA to actions taken in support of the Agreement as it was signed by the United States in 1974; the definition precludes use of the EPCA in support of actions taken to implement any future substantive amendments to the Agreement In addition, § 255 of the EPCA, 42 U S C § 6275, contains a caveat that, "[w]hile the authorities contained in [subchapter II of the EPCA] may, to the extent authorized . , be used to carry out obligations incurred by the United States in connection with the International Energy Program, [subchapter II] shall not be construed in any way as advice and consent, ratification, endorsement, or other form of congressional approval of the specific terms of such program "

[29] The scope and operation of the IEP are discussed more fully *infra* at 687–89

[30] *See* 50 U.S C. app. § 2402(2)(C) The EAA is discussed *infra* at 683–84

if he determines that an exemption would be consistent with the national interest and the purposes of the EPCA. *Id.*

The President's authority to restrict exports of energy supplies and materials under § 103(a) or to waive mandatory restrictions on the export of crude oil and natural gas under § 103(b) is subject to several limitations. First, he must find that the restrictions or exemptions are "appropriate and necessary" to carry out the purposes of the EPCA[31] and consistent with the national interest. 42 U.S.C. § 6212(a), (b)(1), (d). The President's determination of the "national interest" (or the parallel determination by the Secretary of Commerce in implementing export restrictions under this section) must take into account the need to leave uninterrupted or unimpaired: (1) exchanges in similar quantity for convenience or increased efficiency of transportation with persons or the government of a foreign state; (2) temporary exports across parts of an adjacent foreign state; and (3) the historical trading relations of the United States with Canada and Mexico. *Id.* § 6212(d). Second, with respect to restrictions on supplies of materials or equipment other than primary energy sources, the President must determine that the restrictions are necessary either to maintain or for further exploration, production, refining, or transportation of energy supplies, or for the construction or maintenance of energy facilities, within the United States. *Id.* § 6212(a)(2). Third, exemptions from the mandatory export restrictions on crude oil and natural gas required by subsection (b) must be based on a "reasonable classification or basis," such as the purpose for export, class of seller or purchaser, or country of destination. *Id.* § 6212(b)(2).

### 2. Section 106. Accelerated Production Rates

Section 106(a)(1) of the EPCA, 42 U.S.C. § 6214(a)(1), requires the Secretary of the Interior to determine, by rule, a "maximum efficient rate of production" (Mer) and a "temporary emergency production rate" (Ter) for each field on federal lands that produces or is capable of producing significant volumes of crude oil and/or natural gas.[32] Subsection (b) of § 106, 42 U.S.C. § 6214(b),

---

[31] The purposes of the EPCA are broadly defined in § 2, 42 U.S.C § 6201, to include the following.
 (1) to grant specific standby authority to the President, subject to congressional review, to impose rationing, to reduce demand for energy through the implementation of energy conservation plans, and to fulfill obligations of the United States under the international energy program;
 (2) to provide for the creation of a Strategic Petroleum Reserve capable of reducing the impact of severe energy supply interruptions;
 (3) to increase the supply of fossil fuels in the United States, through price incentives and production requirements;
 (4) to conserve energy supplies through energy conservation programs, and, where necessary, the regulation of certain energy uses;
 (5) to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products;
 (6) to reduce the demand for petroleum products and natural gas through programs designed to provide greater availability and use of this Nation's abundant coal resources; and
 (7) to provide a means for verification of energy data to assure the reliability of energy data

[32] The Mer is defined as the maximum rate of production that "may be sustained without loss of ultimate recovery of crude oil or natural gas, or both, under sound engineering and economic principles." 42 U.S.C. § 6214(e)(1). The Ter is the maximum rate of production, above the Mer, that "may be maintained for a temporary period of less than 90 days without reservoir damage and without significant loss of ultimate recovery of crude oil or natural gas, or both. . ." *Id.* § 6214(e)(2)

653

provides that each state may establish a Mer and Ter for any field in the state, other than a field on federal lands, that produces or is capable of producing significant volumes of natural gas or crude oil, and subsection (c), 42 U.S.C. § 6214(c), provides that the Secretary of the Interior may establish a Mer and Ter for unitized fields on federal and non-federal lands for which no Mer or Ter has otherwise been established.

Except with respect to the Naval Petroleum Reserves (NPRs),[33] the President may, at any time, require natural gas or crude oil to be produced from fields on federal lands at the Mer. If the President determines that a severe energy supply interruption exists, he may also authorize production from federal fields at the Ter, or from non-federal or unitized fields on federal and non-federal lands at the Mer or Ter, if such rates have been established by the states or the Secretary of the Interior pursuant to subsections (b) and (c). 42 U.S.C. § 6214(a)(2), (b)(2), (c). This authority could be used to increase domestic crude oil supplies generally by increasing the rate of production from federal fields to the Mer, or, in response to an interruption in petroleum supplies that triggers a presidential finding of a severe energy supply interruption, by increasing production from federal fields to the Ter and from other fields to the Mer or Ter.

### 3. Sections 151–161. Strategic Petroleum Reserve

Sections 151–161 of the EPCA, 42 U.S.C. §§ 6231–6241, *amended by* Pub. L. No. 97–229, § 4, 96 Stat. 250 (1982), provide for creation of a Strategic Petroleum Reserve (SPR) to be available for the purposes of reducing the impact of future disruptions in supplies of petroleum products and fulfilling obligations of the United States under the IEP,[34] and set forth the method and circumstances for drawdown and distribution of the SPR.

### a. Establishment of the SPR

Section 154 of the EPCA directs the establishment of an SPR for storage of up to one billion barrels of petroleum products and preparation of a plan (SPR Plan) outlining proposals for designing, constructing, and filling the storage and related facilities of the Reserve. 42 U.S.C. § 6234(a), (b). The SPR Plan must

---

[33] The NPRs, which are established pursuant to 10 U S C §§ 7420–7438 (1982), are exempt from § 106 of the EPCA. *See* 42 U.S.C § 6214(f). Section 7422(c) of title 10 authorized and directed production of the NPRs at the Mer for a period ending not later than April 5, 1982, and permitted the President to extend such production for additional periods not to exceed three years each Mer production has been extended until April 1985. 17 Weekly Comp. Pres. Doc. 1097 (Oct. 6, 1981). Section 7422(b) of title 10 authorizes the Secretary of Energy to require production of petroleum from the NPRs at the Ter, with the approval of the President, whenever such production is needed for national defense and if such production is authorized by a joint resolution of Congress. 10 U.S C. § 7422(b)(2)

[34] As discussed *infra*, at the discretion of the President, the SPR may be used to fulfill the obligations of the United States under the IEP to participate in an international oil sharing plan in the event of activation of the IEP emergency system. *See infra* at 656

also include a description of the method of drawdown and distribution of the SPR.[35] *Id.* § 6234(e)(12).

In addition, the SPR Plan must provide either for establishment and maintenance on a regional basis of a "Regional Petroleum Reserve" containing sufficient volumes of residual fuel oil or any refined petroleum product to "provide substantial protection against an interruption or reduction in imports of such oil or product," or for storage in the SPR of "substitute" volumes of crude oil and petroleum products sufficient to meet regional needs. 42 U.S.C. § 6237. Section 154(d) of the EPCA, 42 U.S.C. § 6234(d), further directs that the Plan "shall be designed to assure, to the maximum extent practicable, . . . that each noncontiguous area of the United States which does not have overland access to domestic oil production has its component of the [SPR] within its respective territory."

As part of the SPR, the Secretary of Energy[36] may create an Industrial Petroleum Reserve (IPR). 42 U.S.C. § 6236. An IPR would consist of private inventories of petroleum products required to be maintained in excess of normal requirements. The Secretary of Energy has the discretionary authority to establish such a reserve by requiring importers and refiners of petroleum products to acquire, store, and maintain supplies of petroleum products up to 3 percent of the amount they imported or refined in the previous calendar year. In establishing and maintaining an IPR, the Secretary is required to take steps to avoid inequitable economic impacts on refiners and importers, and to maintain an economically sound and competitive petroleum industry. *Id.*

b. Filling the SPR

To implement the SPR, the Secretary of Energy is authorized to acquire petroleum products by purchase, exchange, or other means; the Secretary may also store or exchange crude oil produced from federal lands, including NPR oil and oil that the United States is entitled to receive as royalties. 42 U.S.C. § 6240. Amendments to the EPCA added in 1982 by the EEPA require the President, to the extent funds are appropriated by Congress, to increase the volume of petroleum products in the SPR at a "minimum fill rate" of 300,000 barrels per

---

[35] The SPR Plan and any amendments thereto must be transmitted to Congress pursuant to the procedures provided in 42 U S C § 6421 for approval of "major energy actions " *See* 42 U S.C. § 6239. We believe that procedures such as these, which contemplate either a one-House veto or a two-House approval mechanism, violate the presentation requirement and, insofar as a one-House veto is involved, the bicameralism requirements of Art. I, § 7, cls. 2 & 3 of the Constitution. These clauses require that all congressional actions having the force and effect of law must be adopted by both Houses of Congress and presented to the President for his approval or veto. In addition, legislative veto provisions such as involved here, which purport to allow Congress to play a direct and significant role in the execution of the law, are inconsistent with the principle of separation of powers. *See Consumers Union of U.S., Inc* v *Federal Trade Comm'n,* 691 F.2d 575 (D.C. Cir 1982) *(per curiam) (en banc); Consumer Energy Council of America* v. *Federal Energy Regulatory Comm'n,* 673 F.2d 425 (D C. Cir 1982), pending before the Supreme Court as Nos. 81-2008, 81-2020, 81-2151, 81-2171, 82-177, and 82-209; *Immigration and Naturalization Service* v *Chadha,* 634 F.2d 408 (9th Cir. 1980), pending before the Supreme Court as Nos. 80-1832, 81-2170, and 81-2171

[36] Responsibility for developing and implementing the SPR was originally given to the Administrator of the Federal Energy Administration Pursuant to the Department of Energy Organization Act, 42 U.S.C. §§ 1701-7375 (1982), the Secretary of Energy is responsible for all functions relating to the SPR. *See* 42 U.S C § 7151

day, or 220,000 barrels per day if the President finds that the higher rate would not be in the national interest, until the SPR reaches at least 500,000,000 barrels. Pub. L. No. 97–229, § 4(a), 96 Stat. 250 (1982).[37] In order to facilitate achievement of this fill rate, the EEPA authorizes the leasing or other use of "interim storage facilities." *Id.* § 4(b).

### c. Drawdown and Distribution of the SPR

Section 161, 42 U.S.C. § 6241, governs the drawdown and distribution of petroleum products in the SPR. Drawdown and distribution must be accomplished in accordance with an effective Distribution Plan.[38] The Distribution Plan can only be implemented upon a finding by the President that distribution of the Reserve is required either by (1) a severe energy supply interruption or (2) obligations of the United States under the IEP. *Id.*

The President's authority to withdraw oil in the SPR includes the authority to impose allocation and price controls on that oil. Under § 161(e), 42 U.S.C. § 6241(e), the Secretary of Energy is specifically authorized to provide by rule "for the allocation of any petroleum product withdrawn from the [SPR] in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such rules. Such price levels and allocation procedures shall be consistent with the attainment, to the maximum extent practicable, of the objectives specified in [the EPAA]." The Department of Energy has adopted regulations that would govern the allocation and pricing of SPR crude oil, in the event that such oil were allocated rather than sold through price competition, after a breakdown of the reserve had been triggered by one of the enumerated circumstances. *See* 10 C.F.R. Pt. 220 (1984).

### 4. Sections 201–202. Energy Conservation Contingency Plans

Under § 201 of the EPCA, 42 U.S.C. § 6261, the President is required to develop one or more "energy conservation contingency plans," which are defined by § 202, 42 U.S.C. § 6262, as plans "which impose reasonable restrictions on the public or private use of energy that are necessary to reduce energy consumption."[39] The President is required to submit any energy conservation contingency plan or amendments thereto to Congress accompanied by a statement explaining the need for, rationale of, and operation of the plan. The plan

---

[37] If funds are available to achieve a fill rate higher than the required "minimum fill rate," the EEPA provides that the fill rate be the "highest practicable fill rate achievable." Pub. L. No. 97–229, § 4(a)(1)(D), 96 Stat. 251 (1982). After the SPR reaches 500,000,000 barrels, the President's obligation is to "seek to undertake and continue" a fill rate of 300,000 barrels per day until the SPR reaches 750,000,000 barrels. *Id.* § 4(a)(2).

[38] The currently effective SPR Distribution Plan was submitted to Congress on October 31, 1979. The EEPA requires the Secretary of Energy to transmit a new drawdown plan to Congress by December 1, 1982, as an amendment to the existing SPR Plan. The EEPA specifies that this amendment shall take effect on the date of transmittal to Congress and shall not be subject to provisions in § 159(e) of the EPCA, 42 U.S.C § 6239(e), relating to congressional review of SPR Plan amendments. Pub. L. No 97–229, § 4(c), 96 Stat. 252 (1982).

[39] As enacted, §§ 201 and 203 also required the President to develop a "rationing contingency plan" as part of regulations promulgated under § 4(a) of the EPAA, 15 U.S.C § 753(a). *See* 42 U.S.C. §§ 6261, 6263. This authority expired on September 30, 1981 *See id* § 6263(f) (1976)

must take into account its potential economic impacts, including its effects on vital industrial sectors of the economy, employment, the economic vitality of states and regional areas, the availability and price of consumer goods and services, the gross national product, and any possible anticompetitive effects. *Id.* § 6261(b), (c), (e). Section 201(b)(2) further requires that the contingency plan be approved by a resolution by each House of Congress.[40] *Id.* § 6261(b)(2). In order to implement an effective emergency contingency plan, the President must find that implementation is required by a severe energy supply interruption or by the need to fulfill the obligations of the United States under the IEP. *Id.* § 6261(b)(3).

The President's authority to prescribe particular demand restraint or energy conservation measures pursuant to § 201 is limited by § 202(a)(2), 42 U.S.C. § 6262(a)(2), which prohibits any energy conservation contingency plan from imposing any rationing, tax, tariff, or user fee, from providing for any credit or deduction in computing any tax, and from containing any provision respecting the price of petroleum products. A plan may provide for exemption of individual states or political subdivisions if the President determines a comparable program is in effect in such state or subdivision or that "special circumstances" exist. *See id.* § 6262(b).

### 5. Sections 251, 252, 254. Authorities in Support of the Allocation and Information Provisions of the IEP

Sections 251, 252, and 254 of the EPCA, 42 U.S.C. §§ 6271, 6272, 6274, *as amended by* Pub. L. No. 97–229, § 2, 96 Stat. 248 (1982), provide authority for the President and cooperating U.S. oil companies to take action to implement obligations of the United States under the allocation and information provisions contained in Chapters III, IV, and V of the IEP.

As described more fully in Part II below, under the allocation provisions of the IEP, when a reduction in oil supplies reaches the "trigger" level, the United States may have an obligation to allocate oil to another Participating Country, or may have the right to receive allocations of oil from another Participating Country, depending on calculation of the United States' "supply rights." Chapter III of the IEP Agreement provides that "when the sum of normal domestic production and actual net imports available during an emergency exceeds its supply right [the country] shall have an allocation obligation which requires it to supply, directly or indirectly, the quantity of oil equal to that excess to other Participating Countries." Chapter III obligates the United States and the IEP countries to take "necessary measures" to ensure that such allocation will be carried out. As provided in Chapter IV of the Agreement, there are two types of emergencies that "trigger" or activate a nation's allocation obligations under the IEP Agreement: (1) a selective trigger, which occurs when one or more Par-

---

[40] For the reasons set forth *supra* at n 35, we believe that this two-House approval provision is within the class of so-called legislative veto mechanisms that violate the requirements of Art I, § 7 of the Constitution and the principle of separation of powers.

ticipating Countries suffer a 7 percent or greater shortfall of available supplies measured against final oil consumption during a specified base period; and (2) a general trigger, which occurs when the Participating Countries as a whole suffer a 7 percent or greater shortfall.[41]

The IEP Agreement also provides for the furnishing of information to the International Energy Agency (IEA)[42] during normal and emergency situations. Pursuant to Chapter V, Participating Countries are required to supply to the IEA certain information concerning the international oil market and activities of oil companies, and the possible development of oil shortages, and are responsible for assuring that oil companies subject to their jurisdiction provide them with the required information.[43]

### a. Section 251. International Allocation

Section 251 of the EPCA, 42 U.S.C. § 6271, provides the exclusive statutory authority for the President to require U.S. oil companies to allocate petroleum products to Participating Countries, if such allocation is necessary for the purpose of implementing obligations of the United States under the IEP.[44] That section authorizes the President to promulgate rules requiring that producers, transporters, refiners, distributors, or storers of petroleum products "take such action as [the President] determines to be necessary for implementation of the obligations of the United States under Chapters III and IV of the [IEP] insofar as such obligations relate to the international allocation of petroleum products." The President's authority under that section specifically includes the authority to regulate the allocation and price of petroleum products owned or controlled by oil companies subject to the jurisdiction of the United States.[45] No rule promulgated under § 251 may be made effective unless (1) it has been transmitted to Congress, accompanied by a finding that implementation of the rule is required in order to fulfill the obligations of the United States under the IEP; (2) an "international energy supply emergency" has been declared by the President;[46] and (3) the IEP emergency system has been activated in accordance with the pro-

---

[41] *See infra* at 688–87.

[42] The IEA is the international body set up by the IEP Agreement The supreme decisionmaking body of the IEA is the Governing Board, which includes a representative of each member government. A permanent staff is provided by the establishment of a Secretariat. Much of the work of the IEA is done by several "standing groups," consisting of senior personnel from the Participating Countries.

[43] The IEP information system is discussed *infra* at 688.

[44] Subsection (c)(2) of § 251, 42 U.S.C § 6271(c)(2), makes clear that the authority is exclusive:
No officer or agency of the United States shall have any authority, other than authority under this section, to require that petroleum products be allocated to other countries for the purpose of implementation of the obligations of the United States under the [IEP]

[45] Section 251(a), 42 U S.C. § 6271(a), provides that "[a]llocation under such rule should be in such amounts and at such prices as are specified in (or determined in a manner prescribed by) such rule."

[46] An "international energy supply emergency" is defined by § 252(l)(1), 42 U.S.C. § 6272(l)(1), as. any period (A) beginning on any date which the President determines allocation of petroleum products to nations participating in the international energy program is required by chapters III and IV of such program, and (B) ending on a date on which he determines that such allocation is no longer required. Such a period may not exceed 90 days, but the President may establish one or more additional 90-day periods by making anew the determination under subparagraph (A) of the preceding sentence.

cedures and standards of Chapter IV.[47] No rule may remain in effect longer than twelve months after its transmittal to Congress. *Id.* § 6271(b).

Under § 251, the President has clear authority to require oil companies subject to the jurisdiction of the United States to divert their oil supplies to other Participating Countries, and to determine prices at which such supplies should be sold, if a "trigger" situation has been declared in accordance with Chapter IV of the Agreement and if the President determines that such allocation is necessary to meet the United States' allocation obligations. A related question is whether § 251 provides the President with authority to allocate oil supplies among cooperating oil companies if those oil companies are disadvantaged by diversion of their projected supplies to other countries, when such diversion is necessary to enable the United States to meet its obligations under Chapters III and IV of the IEP Agreement. Although the IEP Agreement does not require that the United States have authority to control the allocation or price of oil domestically in order to ensure that those oil companies that assist the United States in meeting its obligations under the Agreement do not suffer competitively, the Agreement could arguably be interpreted to support the development of such a "fair share" domestic allocation program. Articles 6(1), 9(3), and 9(4) of the Agreement, for example, appear to contemplate that Participating Countries may implement such programs in order to fulfill their international allocation obligations.

> Art. 6(1). Each participating country shall take the necessary measures in order that allocation of oil will be carried out pursuant to [Chapter III] and Chapter IV.
>
>   *  *  *  *  *
>
> Art. 9(3). Insofar as possible, normal channels of supply will be maintained as well as the normal supply proportions between crude oil and products and among different categories of crude oil and products.
>
> Art. 9(4). When allocation takes place, an objective of the Program shall be that available crude oil and products shall, insofar as possible, be shared within the refining and distributing industries as well as between refining and distributing companies in accordance with historical supply patterns.

Section 251 specifically authorizes the President to direct oil companies "to take such action as he determines to be necessary" to meet the international allocation obligations of the United States under the IEP. 42 U.S.C. § 6271(a). Consistent with this language and the arguable breadth of the IEP Agreement, the President could find that a limited domestic "fair sharing" allocation program

---

[47] The second and third requirements were recently added by the EEPA to clarify Congress' intent that § 251 not provide authority for the President to implement allocation or price control requirements prior to activation of the IEP emergency system in accordance with Chapter IV of the Agreement. Pub. L. No 97–229, § 2, 96 Stat. 248 (1982); *see* 128 Cong Rec. S 6065 (daily ed. May 26, 1982) (remarks of Sen. McClure) This requirement would, for example, preclude use of § 251 to direct oil companies to allocate oil in "subcrisis" situations. A fuller discussion of this limitation is provided in Part II *infra.*

would be necessary in order for the United States to meet its IEP allocation obligations through the voluntary cooperation of U.S. oil companies, because such cooperation could well depend on assurances to the participating companies that they would not suffer competitive losses. A presidential determination that such a system is "necessary" to meet those obligations would be accorded substantial deference by the courts. *See generally, e.g., Chicago & Southern Airlines* v. *Western S.S. Corp.*, 333 U.S. 103 (1948); *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); 42 Op. Att'y Gen. 363, 370 (1968). Similarly, the President's determination with regard to the nature of the United States' international allocation obligations under the IEP and the measures to be used to meet those obligations would be accorded substantial deference. *See generally, e.g., Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 561 (1976). It is clear, however, that neither the IEP nor § 251 *requires* the President to develop or implement a domestic "fair sharing" allocation plan.

It is less clear that § 251 could be used to establish comprehensive nationwide allocation and price controls, for example, such as those provided under the EPAA, on the basis that such controls are "necessary" for implementation of the United States' international allocation obligations under the IEP. An allocation and pricing regulation of the breadth available under the EPAA would not, at least in the absence of particular facts, appear to be linked with sufficient directness to fulfillment of the United States' international allocation obligations to justify a presidential finding of necessity. However, any exercise of presidential discretion under § 251 will depend on the particular facts presented. *See generally Federal Energy Administration* v. *Algonquin SNG, Inc., supra,* 426 U.S. at 571.

### b. Section 252. Antitrust Defense

Section 252 of the EPCA, 42 U.S.C. § 6272, authorizes persons engaged in the business of producing, transporting, refining, distributing, or storing petroleum products to develop voluntary agreements and plans of action to facilitate or implement the United States' allocation and information obligations under the IEP, and establishes procedures for development of such agreements and plans and for approval and monitoring by federal officials.[48] That section provides a limited antitrust defense with respect to actions taken by participating companies in developing or implementing agreements that meet the requirements of the section. The antitrust defense is available only if the actions are taken in the

---

[48] Section 252 calls upon the Secretary of Energy to prescribe rules governing, and provides detailed procedural requirements with respect to, meetings held to develop or carry out a voluntary agreement or plan of action 42 U S.C. § 6272(b), (c) *See* 10 C.F R Pt. 209 (1984) The Attorney General and the Federal Trade Commission (FTC) are to participate in the development and execution of voluntary agreements and plans of action and the Attorney General must approve any voluntary agreement or plan of action prior to its implementation. 42 U S C § 6272(d). The Attorney General and the FTC are also to monitor the development and execution of voluntary agreements and plans of action in order to "promote competition and to prevent anticompetitive practices and effects." *Id.* § 6272(e). A "Voluntary Agreement and Plan of Action to Implement the International Energy Program," administered by the Secretary of Energy, was approved in 1976. *See* 41 Fed Reg. 13998 (Apr. 1, 1976). Twenty U S oil companies are now participating in that Agreement On May 8, 1981, the Department of Energy published a revised draft Plan of Action in the Federal Register. 46 Fed Reg 26026 (May 8, 1981).

course of developing or carrying out a voluntary agreement or plan of action, are in compliance with the requirements of the section and any rules promulgated thereunder, and are not taken for the purpose of injuring competition. Section 252(f)(2), 42 U.S.C. § 6272(f)(2), provides that actions taken to implement a voluntary agreement or plan of action must be "specified in, or within the reasonable contemplation of, an approved plan of action" in order to qualify for the antitrust defense. A separate breach of contract defense is also provided if the alleged breach "was caused predominantly by action taken during an international energy supply emergency or to carry out a voluntary agreement or plan of action authorized and approved in accordance with [§ 252]." *Id.* § 6272(k).

The authority in § 252 to develop and implement voluntary agreements or plans of action and the parallel antitrust and breach-of-contract defenses may be relied upon only in support of the United States' allocation and information obligations under Chapters III, IV, and V of the IEP Agreement. Any doubt whether § 252 would authorize actions taken by oil companies that are not provided for by the allocation and information provisions of Chapters III, IV, or V of the IEP was dispelled by the EEPA, which amended § 252 to provide that:

> The authority granted by this section shall apply only to the development or carrying out of voluntary agreements and plans of action to implement chapters III, IV, and V of the international energy program.

Pub. L. No. 97–229, § 2(b), 96 Stat. 248 (1982). *See* discussion *infra* at 694–95.

The legislative history of § 252 makes clear that the antitrust defense was not intended to authorize voluntary agreements among the oil companies for the domestic allocation or pricing of oil supplies, even if the purpose of such allocation were to ease disruptions caused by international allocations necessary to meet the United States' IEP obligations. The report issued by the Senate Committee on the Judiciary states that, at the request of the Ford Administration and of Chairman Hart of the Subcommittee on Antitrust and Monopoly, the requirements of § 121 (the predecessor to § 252) were tailored and limited to specific actions with respect to the international allocation of petroleum and the information system of the IEP. The Report indicates that the defense was intentionally not extended to domestic activities of companies participating in voluntary agreements or plans under § 252. *See* S. Rep. No. 26, 94th Cong., 1st Sess. 43 (1975).

c. Section 254. Exchange of Information with the International Energy Agency

Section 254, 42 U.S.C. § 6274, contains procedures for the transmittal of information to the IEA by the United States government. That section provides that the Secretary of State may transmit to the IEA information and data related to the energy industry that is required to be submitted under the terms of the IEP Agreement. 42 U.S.C. § 6274(a). To the extent feasible, trade secrets and

commercial or financial information must be aggregated to avoid identification of sources before being reported to the IEA by the United States government. *Id.* However, such information may be transmitted directly by the government without aggregation during an international energy supply emergency,[49] or if the President certifies that the IEA has adopted and is implementing security measures to protect against disclosure of the information to any person or foreign nation. *Id.* The President may withhold transmittal of any data or information if he determines that transmittal would prejudice competition, violate the antitrust laws, or be inconsistent with national security. *Id.* § 6274(b). If the confidentiality of information to be transmitted to the IEA is otherwise protected by statute, the Secretary of Energy, prior to giving the information to the State Department, must obtain concurrence in its release from the head of the department or agency authorized to collect or obtain the information. *Id.* § 6274(c).

## B. Defense Production Act of 1950

The Defense Production Act of 1950 (DPA), 50 U.S.C. app. §§ 2061–2169, provides the President with additional discretionary authority that may be available in the event of a substantial shortfall in petroleum supplies. The DPA is not an "emergency" statute, in the sense that the authority provided in the statute may be used only if certain specified "emergency" conditions occur.[50] Rather, the President may use that authority to meet a variety of national defense and national defense preparedness needs, whether or not an "emergency" situation exists. As discussed above, however, our focus in this Memorandum is on statutory authorities that may be available to the President in the event of a future "petroleum emergency." Consequently, our discussion of the scope of the DPA is generally limited to how that statute could be used by the President to respond to such an emergency. Nothing in this discussion is intended to suggest that, subject of course to the requirements of each relevant provision,[51] the DPA may not be used in other contexts or in non-emergency situations.

The purpose of the DPA is to provide for the promotion of the national defense by assuring that adequate productive capacity and supply exist to meet national defense needs. With one exception,[52] exercise of authority provided by the DPA must be linked to the needs of the national defense or of national defense preparedness programs.[53] The President has broad discretion to determine what those needs are and how the DPA authorities may be used, consistent with the

---

[49] This exception is limited, however, to information or data relating to the international allocation of petroleum products. 42 U.S.C. § 6274(a)(2)(B)(i).

[50] One exception is § 710(e), 50 U.S C. app. § 2160(e), which, as we discuss *infra*, authorizes employment of members of the Executive Reserve only "during periods of emergency." *See infra* at 672–73.

[51] *See id.*

[52] *See* discussion of § 101(c), 50 U S.C. app. § 2071(c), *infra* at 668–70.

[53] The term "national defense" is defined by the Act to include "programs for military and atomic energy production or construction, military assistance to any foreign nation, stockpiling, space and directly related activity." 50 U S C. app. § 2152(d).

specific requirements of each provision of the statute.[54] *See generally* H.R. Rep. No. 2759, 81st Cong., 2d Sess. 4 (1950); S. Rep. No. 470, 82d Cong., 1st Sess. 12 (1951). In particular, in his determination of what the national defense requires, it is clear that the President may consider, *inter alia,* the potential impact of severe shortages in petroleum supplies available to the United States. In the Energy Security Act (ESA), Pub. L. No. 96–294, § 102, 94 Stat. 617 (1980), Congress specifically designated energy as a "strategic and critical material" within the meaning of the DPA's Declaration of Policy,[55] and added language to that Declaration to emphasize that preparedness programs, as well as actions to expand productive capacity and supply in order to assure the availability of energy supplies, are linked to the national defense:

> In view of the present international situation and in order to provide for the national defense and national security, our mobilization effort continues to require some diversion of certain materials and facilities from civilian use to military and related purposes. It also requires the development of preparedness programs and the expansion of productive capacity and supply beyond the levels needed to meet the civilian demand, in order to reduce the time required for full mobilization in the event of an attack on the United States *or to respond to actions occurring outside of the United States which could result in the termination or reduction of the availability of strategic and critical materials, including energy, and which would adversely affect the national defense preparedness of the United States. In order to insure the national defense preparedness which is essential to national security, it is also necessary and appropriate to assure domestic energy supplies for national defense needs.*

50 U.S.C. app. § 2062 (amendment emphasized). The Conference Report explained:

> The "Declaration of Policy" is amended to make it clear that it is necessary and appropriate, indeed essential, "to assure domestic energy supplies for national defense needs."

---

[54] As described below, the particular basis for exercise of authority under each of the relevant provisions of the DPA differs somewhat, although, with the exception of § 101(c), 50 U.S C. app. § 2071(c) (*see* n.52), that exercise must be related to the national defense or national defense preparedness programs. Thus, the President has authority under § 101(a), 50 U S.C. app. § 2071(a), to order the priority performance of contracts or allocate materials "to promote the national defense," under § 708, 50 U.S.C. app. § 2158(c)(1), the President may authorize voluntary agreements among private individuals and companies "upon finding that conditions exist which may pose a direct threat to the national defense or its preparedness programs;" the President may employ persons from the private sector without compensation under § 710(b), 50 U S.C app. § 2160(b), "in order to carry out the provisions of [the DPA];" and he may establish and train an Executive Reserve pursuant to § 710(e), 50 U.S.C app § 2160(e), for employment "in executive positions in Government during periods of emergency."

[55] *See* 50 U.S C app § 2076.

H.R. Rep. No. 1104, 96th Cong., 2d Sess. 187 (1980).[56]

Three provisions of the DPA provide the President with authority to respond to a substantial petroleum shortage: § 101, 50 U.S.C. app. § 2071, which authorizes the President to require the priority performance of contracts or orders and to direct allocation of materials, including petroleum products, in certain circumstances; § 708, 50 U.S.C. app. § 2158, which authorizes the President to approve certain voluntary agreements relating to preparedness for national emergencies and thereby to trigger an antitrust defense for persons or companies participating in such agreements; and § 710, 50 U.S.C. app. § 2160, which authorizes the President to employ "persons of outstanding experience and ability" to serve without compensation in advisory positions for purposes of assisting in carrying out the DPA and to establish an Executive Reserve to train private and governmental personnel for employment in executive positions in the government during periods of emergency.

### 1. Section 101(a). Priority Performance of Contracts and Allocation of Materials

Section 101(a) of the DPA, 50 U.S.C. app. § 2071(a), authorizes the President to require performance on a priority basis of contracts or orders that he deems "necessary or appropriate to promote the national defense," and to allocate materials and facilities "in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate to promote the national defense."[57] The authority provided to the President under this section has been characterized by Congress as "broad and flexible." H.R. Rep. No. 2759, 81st Cong., 2d Sess. 4 (1950). Indeed, the House Report on the original version of the DPA noted that § 101(a) would authorize a wide range of actions to meet the national defense needs of the United States:

> [The powers granted under § 101(a)] would include the power to issue orders stopping or reducing the production of any item; orders to prohibit the use of a material for a particular purpose or for anything except a particular purpose; and orders to prohibit the accumulation of excessive inventories. [Section 101(a)] would authorize the President to require filling certain orders in prefer-

---

[56] Congress intended that this amendment to the DPA make explicit the link between domestic energy supplies and the national defense, but it did not intend to grant any new allocation or pricing authority or new authority to engage in the production of energy (except as authorized by the ESA with respect to synthetic fuel production) *See* 50 U.S.C. app. § 2076

[57] The full text of § 101(a) reads as follows.

The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

50 U S C. app. § 2071(a).

ence to other orders, or requiring the acceptance and performance of particular orders.

*Id.; see also* H.R. Rep. No. 639, 82d Cong., 1st Sess. 21–22 (1951). The report of the Senate committee on amendments added to the DPA in 1952 cautions, however, that the section should be used "only where necessary or appropriate to promote the national defense. [It] should not be used to accomplish purposes, however meritorious, which bear no relation to national defense." S. Rep. No. 1599, 82d Cong., 2d Sess. 7 (1952).

In a petroleum emergency, § 101(a) could give the President authority, *inter alia*, to require acceptance of and priority performance under contracts relating to the production, delivery, or refining of petroleum products or to allocate supplies of petroleum products, depending on the circumstances of the emergency.[58] Section 101(a) might also be used to facilitate petroleum transportation during an emergency, for example, by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense.

The President's authority would be subject to certain limitations or would have to rest on certain findings required by the DPA. First, the requisite "national defense" nexus must exist. Use of the authority provided by § 101(a) specifically to respond to a petroleum emergency would have to be based on a presidential determination that the emergency threatens or adversely affects the national defense, as that term is defined in the Act.[59] However, as noted above, Congress has specifically recognized that national defense concerns may be implicated by a shortfall in energy supplies, particularly a shortfall resulting from actions occurring outside the United States. *See supra* at 663. Especially in light of this clear congressional intent, a presidential determination that a substantial reduction in petroleum supplies affects the national defense and security of the United States would be given considerable deference by the courts. *See generally Federal Energy Administration* v. *Algonquin SNG, Inc., supra,* 426 U.S. at 561.

Second, the President's authority is limited by § 101(b), 50 U.S.C. app. § 2071(b), which directs that the powers granted in § 101(a) can be used to

---

[58] It is clear that Congress contemplated use of § 101(a), as well as other DPA provisions, to control the performance of petroleum-related contracts and to allocate petroleum products, if the President were to find such action necessary and appropriate to promote the national defense The 1950 House Report noted that increased demand for certain metals for the military and other programs or for stockpiling "will inevitably cut down on the supply available to industry generally, with consequent dislocations The same situation is present, to a greater or lesser extent, in the case of many other materials, such as many chemicals, *petroleum,* and in the case of many kinds of equipment " H R. Rep. No. 2759, 81st Cong , 2d Sess 7 (1950) (emphasis added). Moreover, the definition of "materials" subject to the President's allocation authority ("raw materials, articles, commodities, products, supplies, components, technical information, and processes") is clearly broad enough to include petroleum products, especially in light of that legislative history. *See* 50 U S.C app § 2152(b), H R Rep No 2759, *supra,* at 7 That interpretation is confirmed by the language and legislative history of the provision of the ESA that clarified that "energy" is a "strategic and critical material" within the meaning of the DPA's Declaration of Policy. *See supra* at 21

[59] As we noted above, the President's authority under § 101(a) to direct priority performance of contracts or to allocate materials, including petroleum, is not necessarily dependent on the existence of a petroleum emergency That authority could be used, for example, to require performance of petroleum supply, production, or transportation contracts or to allocate petroleum supplies on a timely basis, if necessary to meet the needs of a particular defense program, even if no "emergency" situation exists.

control the general distribution of material in civilian markets only if the President finds that the material is a "scarce and critical material essential to the national defense" and that defense needs cannot be met without causing dislocations in that market that will create "appreciable hardship." This section, which was added to the DPA in 1953, was intended to address situations in which defense needs cause a hardship in civilian markets by making large demands on a limited resource or limited production capacity. The House report discussing the 1953 amendment described the need and scope of this restriction:

> In the proposed extension of the priorities and allocation authority the committee has taken cognizance of the conditions which exist today and has proposed that the powers not be used to control the general distribution of any material in the civilian market except in special cases where otherwise, because of demands for national defense of a scarce and critical material, there would be a significant dislocation in the civilian market resulting in appreciable hardship. Nickel at present provides an excellent illustration of the need for authority to provide for equitable distribution of available civilian supplies. It is estimated that during 1953 the military, AEC, and stockpile will take more than one-half of the total supply. These requirements are so heavy as to make it necessary to apportion, as equitably as possible, the residual supply among civilian uses.

H.R. Rep. No. 516, 83d Cong., 1st Sess. 5 (1953).[60]

Thus, § 101(a) provides broader authority for the President to allocate scarce materials among defense agencies, contractors, or suppliers than to allocate supplies of materials among refiners or importers, wholesalers, retailers, and end-users in the civilian market. If there were a direct defense requirement for the material, the material could be allocated to defense agencies or programs or to their contractors upon a finding that such allocation is "necessary or appropriate" to meet those defense needs. A direct defense need could occur, for example, if the material were required by defense preparedness programs of the Department of Defense, the atomic energy programs of the Department of Energy, certain programs of the National Aeronautics and Space Administration, or by a contractor of those agencies. Use of § 101(a) would be justified, *inter alia*, if demand for the material exceeded available supply, if suppliers of a defense-related material were unwilling or unable to supply that material to the govern-

---

[60] Another provision of the DPA, § 701(c), 50 U.S C app. § 2151(c), further limits the President's authority to control the distribution of material in the civilian market Section 701(c) provides:

> Whenever the President invokes the powers given him in this Act to allocate any material in the civilian market, he shall do so in such a manner as to make available, so far as practicable, for business and various segments thereof in the normal channel of distribution of such material, a fair share of the available civilian supply based, so far as practicable, on the share received by such business under normal conditions during a representative period preceding any future allocation of materials: *Provided,* That the President shall, in the allocation of materials in the civilian market, give due consideration to the needs of new concerns and newly acquired operations, undue hardships of individual businesses, and the needs of smaller concerns in an industry.

ment or to defense contractors, or if such a material were otherwise unavailable in a timely fashion through ordinary commercial channels. To take one example, if, as a result of a national petroleum shortage, defense agencies or contractors could not obtain sufficient petroleum products in time to meet the needs of defense preparedness programs, § 101(a) could be used to require suppliers to provide adequate petroleum supplies without regard to their existing contractual commitments. The DPA would relieve the seller of any liability for breach of contract resulting from compliance with such an order. 50 U.S.C. app. § 2157.

On the other hand, the President's authority could not be used to control general distribution in the civilian market unless he were to make the further findings required by § 101(b). Thus, in order to implement a general domestic allocation of petroleum products under § 101(a) in response to a shortage of petroleum supplies, the President would have to find that defense needs for petroleum will reduce supplies of petroleum available to the civilian markets to the point of causing "significant dislocation" and "appreciable hardship." *See* 50 U.S.C. app. § 2071(b).

Third, it is not entirely clear whether the allocation authority contained in § 101(a) gives the President authority to impose price controls. The language of that section, which allows the President to allocate materials and facilities "upon such conditions, and to such extent as he shall deem necessary or appropriate," appears broad enough to authorize price controls.[61] As a practical matter, the President could find that the allocation of materials, particularly from unwilling suppliers, could not be accomplished without some form of price controls. As we have noted before, that is the sort of presidential determination to which the courts will ordinarily defer. *See supra* at 660. We note, however, that there is legislative history that suggests Congress did not intend the authority contained in § 101(a) to include authority to impose mandatory price controls. As enacted in 1950, the DPA empowered the President to impose general wage and price controls. *See* Act of 1950, ch. 932, Title IV, 64 Stat. 803. However, those provisions were allowed to expire in 1953. In renewing other provisions of the DPA 'at that time, Congress specifically stated that the wage and price control provisions were no longer necessary. *See* H.R. Rep. No. 516, 83d Cong., 1st Sess. 2–3, 10–13 (1953). Therefore, in the absence of specific authorization, it is possible that a court may conclude that the DPA does not empower the President to impose mandatory price controls on materials, including petroleum, allocated under § 101(a).[62] *Cf. American Federation of Labor* v. *Kahn,* 618 F.2d 784, 794–96 (D.C. Cir.), *cert. denied,* 443 U.S. 915 (1979). Absent a specific factual setting, it would be inappropriate to speculate further as to how this issue might be resolved in the courts.

---

[61] That language is included only in clause (2) of § 101(a), with respect to allocation of materials and facilities; it does not appear in the language of clause (1) authorizing the President to require acceptance of and priority performance under contracts and orders *Compare* 50 U S C app. § 2071(a)(1) *with id* § 2071(a)(2).

[62] This legislative history would not necessarily preclude some limited regulation respecting price, for example, a requirement of non-discriminatory pricing

Fourth, the President cannot use the allocation authority in § 101(a) to require rationing of gasoline among end-users. 50 U.S.C. app. § 2075.[63]

## 2. Section 101(c). Maximizing Domestic Energy Supplies

Section 101(c) of the DPA, 50 U.S.C. app. § 2071(c), provides that the President may require the allocation of, or the priority performance under, contracts or orders relating to "supplies of materials and equipment in order to maximize domestic energy supplies," if he makes certain findings with respect to the need for the materials for either the exploration, production, refining, transportation, or conservation of energy supplies, or for the construction and maintenance of energy facilities.[64] The President's authority under § 101(c) may be exercised "[n]otwithstanding any other provision of this Act," and therefore is not subject to the "national defense" requirement of § 101(a) or the constraints imposed by § 101(b), 50 U.S.C. app. § 2071(a), (b). This section thus provides some authority for the President to allocate materials in the civilian market, or to require priority performance of contracts, that is not dependent on a national defense nexus or the findings required by § 101(b).

The legislative history of § 101(c) indicates that Congress' specific concern was with bottlenecks in the production and transportation of energy caused by shortages in critical equipment needed for the production and transportation of energy. Section 101(c) was added to the DPA in 1975 by § 104 of the EPCA. The Report of the Senate Committee on Interior and Insular Affairs on the Senate version of the bill discussed the purpose of that provision as follows:

> Section 105 [of the Senate bill] authorizes the President to allocate supplies of materials and equipment associated with the production of energy supplies to the extent necessary to maintain and increase the production and transport of fuels. . . . This provision was included in the title in an attempt to remedy critical shortages and misallocations of pipe, pumps, drilling rigs and roofbolts, which are currently plaguing energy producers.
>
> The committee received the following testimony at a hearing on February 27, 1974, from the Deputy Director at FEO:
>
> > Mr. Sawhill. Well, I think that we have impediments to our domestic production. We have impediments because of the lack of tubular steel that we talked about before. We have impediments because of the lack of drilling rigs in this

---

[63] This restriction was added by § 103 of the ESA, *codified at* 50 U.S C app § 2075, and provides "[n]othing in [the DPA] shall be construed to authorize the President to institute, without the approval of the Congress, a program for the rationing of gasoline among classes of end-users." Because the "approval" of Congress would, of necessity take the form of plenary legislation, such authority would be derived from that legislation and not from § 101(a)

[64] The President must find (1) that such supplies are "scarce, critical, and essential to maintain or further (i) exploration, production, refining, transportation, or (ii) the conservation of energy supplies, or (iii) for the construction and maintenance of energy facilities;" and (2) that "maintenance or furtherance of exploration production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection." 50 U S C. app. § 2071(c)(3).

> country. In other words, no matter what the price is, there are
> only so many wells we can drill, because there are only so
> many rigs available and so much tubular steel available.

S. Rep. No. 26, 94th Cong., 1st Sess. 34 (1975). This legislative history clearly contemplates that § 101(c) could be used, in the event of a petroleum emergency, to maximize available energy supplies through reducing bottlenecks in the production and transportation of energy, for example, to facilitate delivery of equipment necessary for increased energy production.[65]

It is somewhat less clear whether Congress intended that § 101(c) be used to allocate supplies of energy sources, such as petroleum products. Section 101(c) uses the term "materials and equipment." As we have noted, the definition of "materials" contained in the DPA, 50 U.S.C. app. § 2152(b), includes petroleum products. See supra n.58. However, the language of the Senate Report quoted above seems to indicate that the Senate intended the section to encompass only supplies of hardware such as parts and equipment, as distinguished from energy sources such as crude oil, petroleum, coal, natural gas, or petrochemical feedstocks. The authority has been used to date only for that purpose—i.e., to provide assistance to energy production or transportation projects in obtaining scarce equipment and supplies. See, e.g., 10 C.F.R. Pt. 216.

There is legislative history, however, that supports the contrary conclusion that § 101(c) was intended to give the President some authority to allocate energy supplies, including petroleum products, if the requisite findings are made. Senator Randolph, one of the conference bill's floor managers, stated in his remarks introducing the bill on the floor of the Senate:

> Mr. President, the Energy Policy and Conservation Act deals with
> several matters affecting domestic energy supply availability in
> general. Some provisions of S. 622 address leasing practices on
> the Outer Continental Shelf and other Federal lands, as well as the
> availability of energy supplies and equipment for the production
> of domestic energy supplies. For example, authority is provided to
> assure that roof bolts are available for use in the underground
> production of coal—a significant restraint on coal production
> during the oil embargo in the winter of 1973.

121 Cong. Rec. 41022 (Dec. 16, 1975) (emphasis added). Moreover, neither the language of the section nor the legislative history suggests that "materials" as used in § 101(c) should be defined more narrowly than "materials" as used in § 101(a) which, as noted above, include energy sources such as crude oil and petroleum products. In fact, Congress' intent in placing this authority in the DPA rather than in the EPCA was to prevent the creation of two overlapping and

---

[65] Because the authority under § 101(c) to require performance of contracts is limited to contracts or orders "relating to supplies of materials and equipment," 50 U.S C. app § 2071(c), it is questionable whether § 101(c) provides authority to require performance of service contracts. Thus, there is some doubt, for example, whether § 101(c) would support a requirement that a pipeline, marine terminal, or other facility provide transportation services

possibly inconsistent statutory schemes. Senator Proxmire, the sponsor of the amendment to place the authority in § 101 of the DPA, explained its effect as follows:

> [The amendment] is offered to avoid a duplicate allocation mechanism, which could very well conflict with the priorities and allocations program provided for defense programs under [the DPA]. . . .
>
> The effect, then, of the amendment which I have proposed is essentially to take our existing and working allocation system and to broaden it to include domestic energy supplies, while at the same time to provide the authority to reconcile different claims on a basis that will best serve the total national interest. . . .

121 Cong. Rec. 9162 (Apr. 7, 1975) (remarks of Sen. Proxmire).

Thus, although the issue is not free from doubt because of the somewhat conflicting legislative history, § 101(c) could possibly also be used by the President to allocate an energy source such as petroleum products. As a practical matter, however, the usefulness of that authority may be significantly limited by the requirement of § 101(c) that the allocation be necessary to "maximize domestic energy supplies."[66] The legislative history of the section suggests strongly that Congress' intent was to enable the President to take action to increase supplies of energy, not to distribute existing energy supplies. *See supra* at 668–69. While it is conceivable that in limited situations the allocation of petroleum products might serve to increase energy production,[67] it is unlikely that in the event of a severe petroleum shortage § 101(c) could be relied upon to institute a general allocation of scarce supplies of petroleum among oil companies, regions, or end-users.

### 3. Section 708. Voluntary Agreements

Section 708 of the DPA, 50 U.S.C. app. § 2158, provides a limited antitrust defense for persons who carry out voluntary agreements "to help provide for the defense of the United States through the development of preparedness programs and the expansion of productive capacity and supply beyond levels needed to meet essential civilian demand in the United States." The section empowers the President to authorize the making of such voluntary agreements when he finds that "conditions exist which may pose a direct threat to the national defense or its

---

[66] The authority to allocate materials under § 101(c) is also dependent on a finding that the materials are "scarce and critical." *See* 50 U.S.C. app. § 2071(c)(3). Absent a finding of scarcity, § 101(c) would not be available to allocate energy sources In a petroleum interruption, it is likely that this finding could be made, but the availability of the authority would obviously depend on the facts of any particular situation.

[67] There may be some circumstances that would justify a presidential finding that allocation of petroleum products is necessary to "maximize energy supplies." For example, the allocation of petroleum supplies to utilities could be necessary to maximize production of electricity. Arguably, the allocation of petroleum products for use in energy exploration, production, or transportation, such as building or maintaining oil rigs and refineries, might serve to increase total energy production in times of a petroleum shortfall. Allocation to end-users who adopt stringent conservation measures could also arguably provide for the most efficient use of available supplies and therefore increase total supplies.

preparedness programs." 50 U.S.C. app. § 2158(c)(1).[68] Persons or companies participating in approved voluntary agreements may claim an antitrust defense with respect to any act or omission taken in good faith in the course of developing or carrying out such an agreement. *Id.* § 2158(j). No voluntary agreement may be approved unless the Attorney General finds that its purpose "may not reasonably be achieved through a voluntary agreement having less anticompetitive effects or without any voluntary agreement." *Id.* § 2158(f)(1).[69]

The purpose of voluntary agreements authorized by § 708 is specifically "to help provide for the defense of the United States through the development of preparedness programs and the expansion of productive capacity and supply beyond levels needed to meet essential civilian demand in the United States." 50 U.S.C. app. § 2158(c). Because of the scope of the President's authority under the DPA to determine the reach of the term "national defense" and the explicit congressional recognition of the importance of energy preparedness to the national defense (*see supra* at 663), § 708 could be used to authorize a broad range of voluntary agreements among oil companies or with others to plan for or deal with a substantial petroleum shortage that may impair the national defense or national defense preparedness,[70] and would make available an antitrust defense for actions taken to formulate or implement such agreements.

With respect to energy-related activities, however, the § 708(j) antitrust defense is available only for domestic activities taken to develop or carry out a voluntary agreement. Section 708A(o), 50 U.S.C. app. § 2158a(o), makes the antitrust defense unavailable for voluntary agreements to carry out the IEP[71] or to

[68] The original DPA § 708, enacted in 1950 and patterned after the 1942 Small Business Mobilization Act, gave the President broad authority to convey antitrust immunity:
> (b) No act or omission to act pursuant to this Act, . . if requested by the President pursuant to a voluntary agreement or program approved . . [by him] and found by the President to be in the public interest as contributing to the national defense shall be within the prohibitions of the antitrust laws. . . .

There were few procedural restrictions on the exercise of this authority Section 708 was substantially revised in 1975 in conjunction with legislative enactment of § 252 of the EPCA, 42 U.S.C. § 2172. The 1975 DPA amendments reduced the antitrust immunity to a defense, adopted the "good faith" requirement, and imposed procedural safeguards comparable to those contained in § 252 of the EPCA. *See* Pub. L. No. 94–152, § 3, 89 Stat. 810 (1975).

[69] The DPA requires the Attorney General, after consultation with the FTC, to approve rules for the development of voluntary agreements and any voluntary agreement itself 50 U.S C. app. § 2158(e), (f) An agreement may be developed only at meetings in which the Attorney General and an FTC representative participate, and the Attorney General and the FTC are required to monitor the implementation of any voluntary agreement. *Id* § 2158(e)(3), (g). The Attorney General is granted the authority to terminate an agreement at any time. *Id.* § 2158(h) The Attorney General and the FTC are given access to all relevant information, and have rulemaking authority to carry out their responsibilities. *Id.* § 2158(h), (i) Finally, both the Attorney General and the FTC are required to conduct surveys of the competitive effects of voluntary agreements, and the Attorney General must submit reports to Congress on the administration of any operative agreements. *Id* § 2158(k).

[70] The authority contained in § 708 has been used in the past to authorize cooperation and exchange of information relating to the impact of petroleum shortages on the national defense A "Voluntary Agreement Related to the Supply of Petroleum to Friendly Foreign Nations" was approved by the Attorney General and entered into on June 26, 1951. It was superseded by the "Voluntary Agreement on Foreign Petroleum Supply" approved June 1, 1953. This Agreement, formed under the sponsorship of the Department of the Interior, remained in effect until 1976. The Agreement was activated in response to international events, including the nationalization of the Suez Canal, the 1967 Six Days War, and the 1973 Yom Kippur War.

[71] As discussed above, § 252 of the EPCA, 42 U.S C. § 6272, provides the only statutory antitrust defense for industry activities pursuant to authorized voluntary agreements or plans of action in support of the IEP. *See supra* at 660–61. Section 708A(o) was added to the DPA at the time the EPCA was enacted, apparently with the intent of limiting duplication in the scope of § 252 of the EPCA and the existing antitrust defense in the DPA. *See* 121 Cong
Continued

voluntary agreements which "in whole or in part" are in furtherance of a "treaty or executive agreement to which the United States is a party or to implement a program of international cooperation between the United States and one or more foreign countries." This precludes use of § 708 to implement any voluntary "fair sharing" program to meet IEP obligations,[72] or to fulfill international obligations such as NATO oil supply commitments and the United States–Israel oil supply agreement.

In order to qualify for the defense, the conduct in question must have been undertaken in good faith, and the persons claiming the defense must have acted in accordance with the statute, applicable regulations, and the applicable voluntary agreement. 50 U.S.C. app. § 2158(j). The procedures imposed on meetings to develop and carry out voluntary agreements under § 708 of the DPA are quite similar to those imposed by § 252 of the EPCA, 42 U.S.C. § 6272. Public notice must be given, and the public must be afforded an opportunity to participate (unless the meeting concerns classified matters, matters specifically exempted by statute from disclosure, or matters related to trade secrets and proprietary data); the meeting must be attended by a federal employee (and chaired by the President's delegate if the meeting is to develop a voluntary agreement) and must be monitored by representatives of the Attorney General and the FTC; if the meeting is to develop a voluntary agreement, records and verbatim transcripts must be kept. The President's delegate or the Attorney General (after consultation with the FTC) may terminate or modify an agreement. *Id.* § 2158(e). Unlike § 252, however, § 708 does not contain any specific provision for adoption of plans of action.

Section 708(d), 50 U.S.C. app. § 2158(d), provides for establishment of advisory committees to aid the President or his delegated officers in carrying out the purposes of the section. Such committees would be subject to the provisions of the Federal Advisory Committee Act, 5 U.S.C. app. §§ 1–15 (1982) and provisions of the Federal Energy Administration Act of 1974, 15 U.S.C. § 776. Section 708(d) further provides that "in all cases such advisory committees . . . shall include representatives of the public, and the meetings of such committees shall be open to the public." 50 U.S.C. app. § 2158(d)(1).

### 4. Section 710. Employment of Persons from the Private Sector

Pursuant to § 710 of the DPA, 50 U.S.C. app. § 2160, the President may, subject to certain restrictions, authorize the training and employment of persons from the private sector in order to facilitate planning for and responding to energy emergencies. Two methods of facilitating such training and employment are authorized by this section. Subsection (b) permits the President to employ "persons of outstanding experience and ability" to serve without compensation

---

Rec. 36619 (Nov 14, 1975) (remarks of Reps. Dingell and Ashley). The amendment also had the effect, however, of narrowing the scope of the existing DPA provision and of the original House bill, which had provided antitrust protection for international voluntary agreements beyond the IEP.

[72] *See supra* at 659–60

in advisory positions for purposes of assisting in carrying out the purposes and provisions of the DPA. *Id.* § 2160(b). Subsection (e) authorizes the establishment and training of a "nucleus executive reserve" (Executive Reserve) for employment during "periods of emergency." *Id.* § 2160(e). Use of these authorities to obtain advice and assistance from the private sector in planning for or responding to an emergency caused by a petroleum shortage raises two legal issues: (1) the circumstances under which these authorities can be used; and (2) the applicability of conflict-of-interest and antitrust laws and regulations.

### a. Circumstances Governing Use of Employees

Persons serving without compensation (WOCs), under § 710(b), 50 U.S.C. app. § 2160(b) may be used as necessary and appropriate to carry out the provisions of the DPA. Their service is not limited to times of emergency, and WOCs can therefore be employed for a variety of preparedness tasks, such as assisting in planning, providing counsel and assistance in conducting exercises or seminars, or assisting state and local officials to develop emergency preparedness plans and programs. WOCs may be employed, however, only if the employing department or agency head certifies that he or she has been "unable to obtain a person with the qualifications necessary for the position on a full-time, salaried basis," and that the appointment is necessary and appropriate to carry out provisions of the DPA. 50 U.S.C. app. § 2160(b)(1), (5). WOCs may be appointed only to advisory or consultative positions, except that they may be appointed to decisionmaking (but not policymaking) positions if they are found to possess outstanding experience and ability not obtainable on a full-time, salaried basis. *Id.* § 2160(b)(2).

Under subsection (e), 50 U.S.C. app. § 2160(e), persons from either the private sector or from within the federal government may be appointed to an Executive Reserve.[73] During "periods of emergency" those individuals may be employed by the government either as regular federal employees or as WOCs. *See* S. Rep. No. 696, 84th Cong., 1st Sess. 9 (1955). Employment of a Reservist as a WOC would, of course, be subject to the limitations imposed by subsection (b). However, employment of a Reservist as a regular full- or part-time federal employee would not be subject to the limitations contained in subsection (b) with respect to use of the individual in decisionmaking or policymaking positions or with respect to compensation,[74] and would not require the employing federal

---

[73] By executive order, the President has established a "National Defense Executive Reserve," which is composed of "persons selected from various segments of the civilian economy and from government for training for employment in executive positions in the Federal Government in the event of the occurrence of an emergency that requires such employment." Exec Order No 11,179, 3 C FR. 246 (1964–65), *as amended by* Exec. Order No. 12,148, 3 C FR. 412 (1979). In addition, the President has delegated authority to employ WOCs to heads of departments or agencies that exercise DPA functions. Exec Order No 10,647, 3 C FR. 282 (1954–58), *as amended by* Exec Order No. 11,355, 3 C.F.R. 653 (1966–70), *and* Exec Order No 12,107, 3 C.F.R. 264 (1978).

[74] The only provision respecting compensation of Reservists is that members who are not full-time government employees may be allowed transportation and per diem payments for the purpose of participating in the Executive Reserve training program In the absence of any further restriction, it appears that Reservists could be employed as full-time, part-time, temporary, or unsalaried government employees in times of emergency. The legislative history of subsection (e) supports this conclusion. *See* S Rep. No. 696, 84th Cong., 1st Sess. 9 (1955).

agency to find that no full-time federal employee is available and qualified to perform functions to be performed by the Reservist.

The major limitation on the President's authority to use the Executive Reserve is that Reservists can be employed by the government only "during periods of emergency." *See* 50 U.S.C. app. § 2160(e).[75] The DPA does not define what constitutes an "emergency" for purposes of activation of the Reserve.[76] Section 710(e), however, must be read in light of the purpose of the DPA to protect and promote the national defense, as expressed in the Declaration of Policy. Subsection (e), authorizing the Executive Reserve, was added to the DPA in 1955. At the same time, the Declaration of Policy was amended to include a specific congressional finding that the Nation's mobilization program requires the development of preparedness programs and the expansion of productive capacity and supply "in order to reduce the time required for full mobilization in the event of an attack on the United States." *See* S. Rep. No. 696, 84th Cong., 1st Sess. 9 (1955). The Senate Report draws a direct link between authorization of the Executive Reserve and the Declaration of Policy:

> This provision [now section 710(e)] supports the added emphasis placed on preparedness for a period of full mobilization in the Declaration of Policy.

*Id.* at 8. The legislative history of subsection (e) thus makes clear that establishment and training of the Reserve and employment of Reservists is specifically intended to further the national defense preparedness aims of the DPA.[77]

Therefore, activation of the Reserve would depend on the existence of an emergency that, in the language of the Declaration of Policy, "would adversely affect the national defense preparedness of the United States." 50 U.S.C. app. § 2062.[78] Likewise, although § 710 does not limit *in haec verba* the functions

---

[75] This limitation does not preclude participation by Reservists in orientation and training, it does, however, preclude participation in the type of pre-emergency preparedness tasks that may be performed by WOCs

[76] No other provision of DPA specifically limits the President's authority to "periods of emergency."

[77] When Congress intended to eliminate the requirement of a "national defense" nexus, as in § 101(c), 50 U.S.C. app. § 2071(c), it did so in express terms *See supra* at 668. The absence of any such limitation in § 710(e) is further evidence that Congress did not intend that the Executive Reserve be used for purposes unrelated to the national defense. *See generally United States* v. *Rutherford,* 442 U.S. 544, 552 (1979), *KSK Jewelry Co.* v. *Chicago Sheraton Corp..* 283 F.2d 8, 11 (7th Cir. 1960).

[78] Section 710(e) does not, however, expressly require the President to declare a national emergency in order to activate the Reserve. *See* 50 U.S.C. app. § 2160(e). Therefore, we believe use of the Reserve is not subject to the provisions of the National Emergencies Act (NEA), 50 U.S.C. §§ 1601–1651 (1982). The legislative history of the NEA makes clear that use of authorities under the DPA, such as the Executive Reserve, is not subject to that Act In testimony before the House Subcommittee on Administrative Law and Governmental Relations, Assistant Attorney General Scalia of the Office of Legal Counsel noted that:
> [L]aws like the Defense Production Act of 1950, which do not require a Presidential declaration of emergency for their use, are not affected by this title [*i.e.,* Title I]—even though they may be referred to in a lay sense as "emergency" statutes.
*Hearings before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, House of Representatives,* 94th Cong., 1st Sess. 91 (1975). That comment is repeated in both the House and Senate reports. *See* H.R. Rep. No 238, 94th Cong., 1st Sess. 5 (1975), S. Rep. No. 1168, 94th Cong., 2d Sess. 4 (1976). Although this language refers only to Title I of the NEA, which terminated existing emergencies, there is nothing in the legislative history to suggest that the DPA is subject to the procedural requirements imposed by Title II of the NEA with respect to the future use of emergency authorities Rather, the Senate Report states that "[t]he provisions of Title II . . . are designed to insure congressional oversight of Presidential actions *pursuant to declarations of a national emergency authorized by an act of Congress.* . . . The legislation is directed solely to Presidential *declarations of emergency"* S. Rep No 1168, *supra* at 4 (emphasis added).

674

that can be performed by Executive Reservists in the event of activation, the inclusion of authority for the Executive Reserve in the DPA and the legislative history of that section make clear that those functions are limited to achievement of the national defense preparedness and response purposes of the DPA.

As discussed above, however, the DPA's Declaration of Policy expressly contemplates that disruptions in energy supplies may affect the national defense interests of the United States. *See supra* at 663. Therefore, the President has broad discretion, in the event of a disruption in petroleum supplies, to determine that an energy emergency exists that could threaten national security or national defense preparedness and that would therefore justify activation and use of the Executive Reserve to assist in meeting the emergency.

### b. Conflict-of-Interest and Antitrust Restrictions

A second question is whether individuals who serve as WOCs or Executive Reservists would be subject to conflict-of-interest restrictions imposed by federal laws and regulations or to liability under the antitrust laws. We believe that WOCs and Executive Reservists would be subject to conflict-of-interest and antitrust restraints, but the nature of these restraints could differ depending on the circumstances of their government employment and the nature of their ties to private employers.

*1) Conflict-of-Interest Restrictions:* Applicability of federal conflict-of-interest restrictions to WOCs and Executive Reservists would depend on whether those individuals would be considered to be federal officers or employees within the meaning of applicable statutes and regulations. The Federal Personnel Manual (FPM), App. C., sets forth the principles for determining whether persons serving the federal government on a temporary or intermittent basis are subject to the conflict-of-interest laws. Briefly, the FPM distinguishes between (1) persons "whose advice is obtained by an agency . . . because of [their] individual qualifications and who serve . . . in an independent capacity" and (2) persons who are asked "to present the views of . . . nongovernmental organization[s] or group[s] which [they] represent, or for which [they are] in a position to speak." FPM, App. C at C–6. The former category of independent experts are deemed to be subject to the conflict-of-interest laws because their service to the government is expected to be impartial and free from outside influence or control. The latter category of private representatives, on the other hand, are not subject to the conflict-of-interest laws because it is expected that such persons would be influenced by the private groups that they have been chosen to represent.[79]

We believe that the language and legislative history of § 710 are clear that the purpose of employment of WOCs and Executive Reservists is to obtain independ-

---

[79] We have found that these FPM criteria are ordinarily the most useful standards to apply in determining whether particular persons are federal employees for purposes of the conflict-of-interest laws. There are, however, other factors that may be relevant to such a determination For example, if a person performs a government function, receives a government salary, or is supervised directly by government employees, it is likely that he or she will be deemed a federal employee for other personnel purposes. *See* 5 U S C § 2105(a) (1982), and *Lodge 1858, AFGE* v. *NASA,* 424 F Supp. 186 (D.D.C. 1976)

ent assistance and advice from uniquely qualified individuals,[80] and that therefore those individuals would be considered to be federal employees subject to conflict-of-interest restrictions, when they are actually employed to provide such assistance and advice.[81] The scope of the conflict-of-interest restrictions applicable to a particular individual would depend, *inter alia*, on whether the individual is a "special government employee"[82] and whether he or she receives compensation for his or her services.

Since WOCs or Reservists could be employed by any of several federal agencies, consistent with the scope of the DPA, it is impossible to summarize here all of the applicable conflict-of-interest statutes and agency conduct standards. We note, however, that 18 U.S.C. §§ 208 and 209 would be of particular concern to an individual who comes from private employment to serve the federal government on a temporary or intermittent basis as a WOC or Executive Reservist. Section 208 imposes criminal penalties on any government employee, including a special government employee, who participates personally and substantially for the government in a matter in which he, his spouse or minor child, or a partner or an organization by which he is employed, has an arrangement for future employment, or is negotiating concerning employment, or has a financial interest. Under appropriate circumstances, government agencies may grant waivers of this prohibition. *See* 18 U.S.C. § 208(b). Section 209 imposes criminal penalties on any regular government employee who receives any salary, or contribution to or supplementation of a salary, from a private source as compensation for services as a government employee. *Id.* § 209.[83] Special government employees and employees serving without compensation are not prohibited by § 209 from accepting a salary from an outside source for performance of their government duties. *Id.* Apart from § 209, the standards of conduct of the employing agency may limit the receipt of gifts or certain things of value by individuals subject to the standards, if the source of the compensation has a business relationship with the agency. Those limitations may differ depending on whether the individual is a regular or special government employee.[84]

---

[80] In fact, § 710 originally provided for an exemption from the federal conflict-of-interest laws for WOCs and Reservists, which demonstrates that Congress certainly contemplated that such individuals would be considered to be federal employees for purposes of the conflict-of-interest laws. When the federal conflict-of-interest laws were recodified in 1962, the recodification act made that exemption inapplicable Pub. L No 87–849, § 2, 76 Stat 1126 (1962)

[81] We do not believe that Executive Reservists would generally be considered officers or employees of the federal government during orientation or training for mobilization assignments, because they would not normally act or advise on any matters pending before a federal department or agency during such periods. If, however, the responsibilities of a Reservist during training or orientation included assistance or advice to a federal department or agency, the conflict-of-interest restrictions would probably apply, depending on the facts of the particular situation.

[82] A "special government employee" is a federal employee or officer who serves for no more than 130 days during any period of 365 days, on a full-time or intermittent basis. *See generally* 18 U S C § 202(a). Under federal personnel rules, an agency may not appoint an individual to serve as a special government employee unless "at the time of his original appointment" the agency's "best estimate" is that during the following 365-day period the services of the appointee will be needed for 130 days or less. *See* FPM, App C

[83] Section 209 also imposes criminal penalties on any organization or individual that makes any such contribution or supplementation 18 U S.C. § 209(a)

[84] For example, regulations of the Department of Energy prohibit regular employees from accepting fees, compensation, gifts, payment of expenses, or any other thing of monetary value if the circumstances "may result in, or create the appearance of, a conflict of interest" 10 C.F R. § 1010 204(a) *See also* § 1010 604 (special

Continued

Other provisions of the federal criminal code impose restrictions on the ability of government employees to assist private parties in matters involving the government,[85] and on former government employees representing others in matters that they worked on or were responsible for, while in the government.[86] Additional restrictions may be imposed by statutes that are specific to the employing agency. The Department of Energy Organization Act, for example, imposes requirements or restrictions on certain Department employees with respect to divestiture and disclosure of financial interests, reporting of pre- and post-government employment, and appearances before the Department after employment. *See* 42 U.S.C. §§ 7211–7216.

*2) Antitrust Exposure:* Individuals who serve as WOCs or Executive Reservists and their private employers would also be subject to the antitrust laws. It is likely that any individual called to government service as a WOC or as a regular federal employee would retain some ties with his or her former private employer, and would probably return to private employment upon completion of government service. In light of these dual public and private roles, actions taken by the individual while employed by the government might raise questions of antitrust liability for the individual and the employer.[87] Actions that may raise some question under the antitrust laws could include, for example:

> (1) advice to government policymakers with respect to governmental actions to be taken in markets in which the individual's company is involved;

> (2) decisions that affect particular energy markets;

> (3) agreements as to what actions are to be taken by their private firms, particularly if those individuals implement such actions in their private capacities; or

> (4) exchange between private industry executives of confidential industry information, gained pursuant to training activities or governmental responsibilities.

In general, antitrust liability attaches only to private conduct that has anticompetitive conseqences. *See Parker* v. *Brown,* 317 U.S. 341 (1943); *Sea-Land*

---

government employees). Regulations issued by the Office of Personnel Management require that agency standards of conduct contain a provision that prohibits regular employees from soliciting or accepting any compensation or other thing of value, subject to certain exceptions, from a person who:

  (1) Has, or is seeking to obtain, contractual or other business or financial relations with his agency;
  (2) Conducts operations or activities that are regulated by his agency, or
  (3) Has interests that may be substantially affected by the performance or nonperformance of his official duty.
5 C.F.R § 735.202.

[85] *See, e g ,* 18 U.S.C. §§ 203, 205

[86] *See, e.g ,* 18 U.S.C § 207

[87] In general, antitrust exposure would probably be greatest when individuals are actually employed by the government in policymaking or decisionmaking positions, because they would then be in a position to make or affect governmental decisions that may have an impact on a particular industry or employer. However, it is possible, though less likely, that antitrust liability could attach for particular actions taken in the course of training and orientation, for example, for an exchange with other industry personnel of confidential information gained during the training program.

*Service, Inc.* v. *The Alaska Railroad,* 659 F.2d 243 (D.C. Cir. 1981), *cert. denied,* 455 U.S. 919 (1982). Thus, actions taken by a governmental official within the scope of his authority do not ordinarily give rise to antitrust concerns. On the other hand, actions of WOCs or Reservists that cause competitive harm could result in antitrust liability if such individuals are acting outside the scope of their governmental activity.[88]

### C. *Trade Expansion Act of 1962*

The Trade Expansion Act of 1962 (TEA), 19 U.S.C. §§ 1801–1991, provides the President with certain authority with respect to imports of crude oil and petroleum products, which may be available in the event of a severe shortage of petroleum supplies. Section 232(b), 19 U.S.C. § 1862(b), provides that, upon an investigation and finding that a commodity is entering the country "in such quantities or under such circumstances as to threaten to impair the national security," the President "shall take such action, and for such time, as he deems necessary to adjust the imports of [the] article and its derivatives so that . . . imports [of the article] will not threaten to impair the national security."

Presidents have often exercised this authority to respond to emergencies of different types and their actions have usually been sustained by the courts. In recent decades, Presidents have invoked national security successfully to establish quotas on volumes of imports, including oil,[89] to establish license-fee systems,[90] to limit imports from certain countries,[91] and to allocate oil imports exempt from import fees to certain refineries.[92]

The President's powers under § 232(b) have received a broad interpretation. The authority of the President to take "such action as he deems necessary" was broadly construed by the Supreme Court in *Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548 (1976), which upheld the President's power to impose license fees. Throughout its decision, the Court cited with approval those portions of the legislative history that support the widest reasonable interpretation of the President's authority, such as the statement that it included the power "to take whatever action he deems necessary to adopt imports [including the use of] tariffs, quotas, import taxes or other methods of import restrictions." 426 U.S. at 564; *see also id.* at 558, 561–69.

In *Algonquin,* however, the Supreme Court also expressed the caveat that its opinion applied only to measures with an "initial and direct" effect on petroleum imports and not necessarily to presidential action with a "remote" effect on

---

[88] *Cf. Harlow* v *Fitzgerald,* 102 S. Ct 2727 (1982); *Butz* v. *Economou,* 438 U S 478 (1978); *Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962); *Alabama Power Co.* v. *Alabama Electric Cooperative, Inc.,* 394 F 2d 672 (5th Cir), *cert denied,* 393 U.S. 1000 (1968)

[89] Proclamation 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959) This proclamation was issued pursuant to a predecessor statute

[90] Proclamation 4210, 9 Weekly Comp. Pres. Docs. 406 (Apr 18, 1973).

[91] President Carter utilized this authority to prohibit imports from Iran. Proclamation 4702, 44 Fed. Reg. 65581 (Nov. 14, 1979).

[92] *See. e g., FEA* v. *Algonquin SNG, Inc.,* 426 U.S 548, 570–71 (1976); *Pancoastal Petroleum Ltd.* v. *Udall,* 348 F 2d 805, 807 (D.C. Cir 1965).

imports. 426 U.S. at 571.[93] This caution suggests that a court might limit the President's broad flexibility under the TEA to regulate imports of crude oil or petroleum products to measures whose primary purpose and impact is confined to imported, rather than domestic, supplies of those products. It is possible, therefore, that an attempt to control directly the price of, or to allocate, petroleum products refined in the United States would be ruled invalid by the courts, at least if the impact of such controls on oil imports would be remote and indirect and if the impact on domestic supplies would be direct. In the absence of a particular factual situation, however, we cannot predict whether the courts would strike down such allocation or pricing regulation.

Exercise of authority under § 232(b) must be based on a finding that the imports "threaten to impair the national security." The statute provides some guidance with respect to that finding by listing a number of illustrative factors that may be taken into account, as follows:

> (1) domestic production needed for projected national defense requirements;
>
> (2) capacity of domestic industries to meet defense requirements;
>
> (3) existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense;
>
> (4) requirements of growth of such industries and such supplies and services; and
>
> (5) the quantities, availabilities, character and use of imported articles as those affect such industries and the capacity of the United States to meet national security requirements.

19 U.S.C. § 1862(c).[94]

The legislative history of § 232(b) firmly establishes that increasing the domestic production of oil is a legitimate national security aim. *See, e.g.,* 104 Cong. Rec. 10542–43 (June 9, 1958) (remarks of Rep. Mills). Recent practice, tacitly approved by the Supreme Court in *Federal Energy Administration* v. *Algonquin SNG, Inc., supra,* suggests that reducing the consumption of oil may similarly be a legitimate national security aim. Thus, it seems likely that a court would sustain a presidential finding that imports of crude oil and petroleum products "threaten to impair the national security," *see* 19 U.S.C. § 1862(b), and thereby uphold the use of § 232(b).

---

[93] This *dictum* later was relied upon by a federal district court to strike down the Gasoline Conservation Fee imposed by President Carter on the ground that the fee was beyond the scope of the authority conferred by § 232(b) *Independent Gasoline Marketers Council* v *Duncan,* 492 F Supp 614, 616–18 (D.D C 1980). The court ruled that the measure was principally a conservation measure and only indirectly a restriction on imports, and thus not authorized by the TEA. The district court's decision has little, if any, precedential effect, because the appeal was dismissed as moot and the opinion vacated after the fee was repealed by Congress.

[94] The text and the legislative history of this provision state that these considerations are illustrative but not exclusive. *See* S Rep. No. 1838, 85th Cong., 2d Sess 11–12 (1958)

The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (1982), provides the President, in the event of a national emergency, with plenary control over property that is subject to U.S. jurisdiction and in which any foreign country or national thereof has an "interest." *See generally Dames & Moore* v. *Regan,* 453 U.S. 654, 675 (1981). If a petroleum shortage is sufficiently severe to invoke a presidentially declared national emergency, the IEEPA could be used to control supplies of petroleum products in which foreign countries or foreign nationals have an "interest."

The key provision of the IEEPA is § 203, 50 U.S.C. § 1702(a)(1), which states that the President may:

(A) investigate, regulate, or prohibit—
   (i)  any transactions in foreign exchange,
   (ii) transfer of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
   (iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.[95]

The reach of § 203 is limited by § 202, 50 U.S.C. § 1701, which provides that the President may use these authorities only to deal with an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Section 202 also requires that the President declare a new national emergency for each new threat before he may exercise the emergency powers. *Id.*

---

[95] This provision was taken almost verbatim from § 5(b) of the Trading with the Enemy Act (TWEA), 50 U.S C. app § 1–44 (1982), which gave the President certain authorities "[d]uring time of war or during any other period of national emergency declared by the President." The IEEPA removed from the TWEA the President's authorities "during any other period of national emergency" and placed those authorities in § 203(a)(1) of the IEEPA, 50 U S.C. § 1702(a)(1). The TWEA currently provides the President with authority "during time of war" that is identical in most respects to that available under the IEEPA, but also permits the President to exercise some additional powers not encompassed in the IEEPA, such as seizing and vesting of enemy property and control over wholly domestic economic transactions *See* 50 U S.C. app. § 5(b)(1); H.R Rep No. 459, 95th Cong , 1st Sess. 15 & n.23 (1977).

Section 204(a) of the IEEPA, 50 U.S.C. § 1703(a), provides that the President "in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter, and shall consult regularly with the Congress so long as such authorities are exercised." Section 204(b), 50 U.S.C. § 1703(b), requires that "[w]henever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying" the circumstances necessitating the exercise of his authority; the reasons that the circumstances constitute an unusual and extraordinary threat; the authorities to be exercised and the actions to be taken; the reasons that such actions are necessary; a list of foreign countries with respect to which such actions are to be taken; and the reasons for such decisions.[96]

The scope of the authority available under the IEEPA to respond to an energy emergency, assuming the requisite findings have been made, depends on the breadth the courts are willing to accord to the term "interest" as used in § 203, 50 U.S.C. § 1702, in the context of a future petroleum shortage. The IEEPA does not define the term "interest," but the legislative history of the statute notes that the authorities available to the President "should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." H.R. Rep. No. 459, 95th Cong., 1st Sess. 10 (1977). In addition, in cases decided under the TWEA (*see supra* at n.95) the courts have interpreted the same language in § 5(b)(1) of that statute, 50 U.S.C. app. § 5(b)(1), broadly.[97] The primary substantive limitation on the President's emergency authority is that § 203 of the IEEPA may not be used to regulate wholly domestic transactions. The House Report states that:

> the scope of the authorities should be clearly limited to the regulation of international economic transactions. Therefore the bill does not include authorities more appropriately lodged in other legislation, such as authority to regulate purely domestic transactions or to respond to purely domestic circumstances. . . .

H.R. Rep. No. 459, *supra* at 10–11; *see also* S. Rep. No. 466, 95th Cong., 1st Sess. 5 (1977).[98]

In light of this legislative history, we believe that the President would have broad discretion under the IEEPA to determine whether a foreign nation or national has an "interest" in property subject to U.S. jurisdiction, and, if so, whether any of the authority granted in § 203 should be exercised over that

---

[96] There is no provision in the IEEPA for a legislative veto of the President's actions. However, the declaration of an emergency under the IEEPA would be subject to the NEA (*see supra* n 78), which provides, *inter alia*, that Congress has the authority to terminate by concurrent resolution any national emergencies declared after September 14, 1976. *See* 50 U.S C § 1622(c) For the reasons set forth in n 35 *supra*, we believe this legislative veto provision of the NEA is unconstitutional.

[97] *See, e g., Heaton* v *United States*, 353 F.2d 288, 291–92 (9th Cir. 1965). *cert. denied*, 384 U S. 990 (1966); *United States* v *Broverman*, 180 F. Supp. 631, 636 (S D N.Y 1959).

[98] The House Report specifically notes that the IEEPA would not grant the President the same authority to regulate purely domestic transactions as would be available in time of war under the TWEA, for example, regulation of the hoarding of gold by U.S. citizens or the extension of consumer credit by U S businesses. *See* H.R Rep No. 459, 95th Cong , 1st Sess. 15 & n.23 (1977).

property, provided the President does not attempt to regulate transactions that are purely domestic in nature.

For example, the term "interest" would include, but not be limited to, contract rights of foreign countries or their nationals to acquire or control the disposition of property, such as contingent rights or royalty interests in petroleum products owned or controlled by a company subject to U.S. jurisdiction. In the event of an emergency meeting the requirements of § 202, 50 U.S.C. § 1701, the President would therefore have authority to regulate the use, transportation, and disposition of those petroleum products. The authority contained in § 203 of the IEEPA could also be used to regulate imports of petroleum products acquired from foreign nations or nationals. For example, in time of a national emergency, the IEEPA would give the President authority to require American companies and foreign entities they control[99] to ship petroleum products they acquire abroad to other nations.

On the other hand, the authority would probably not extend to property within the United States that is wholly owned by a U.S. company or individual, because the effect of regulation of such property would most probably be considered to be "wholly domestic." For example, the authority granted the President in times of a national emergency under the IEEPA probably would not extend to authorization of domestic pricing or allocation regulation.

## E. Emergency Energy Conservation Act of 1979

Title II of the Emergency Energy Conservation Act of 1979 (EECA), 42 U.S.C. §§ 8501–8541 (1982), provides the President with discretionary authority to impose energy demand restraint measures in certain emergency circumstances as defined in that Act or to meet IEP obligations. Section 211(a) of the EECA, 42 U.S.C. § 8511(a), authorizes the President to establish energy conservation targets for any energy source on a nationwide and state-by-state basis if the President determines that a "severe energy supply interruption" exists or is imminent,[100] or that such action is required in order to fulfill obligations of the United States under the IEP.[101] If such targets are set, the states are required to develop and submit to the Department of Energy plans to provide

---

[99] American corporations are clearly subject to the jurisdiction of the United States. See Restatement (Second) of Foreign Relations Law of the United States, §§ 27, 30 (1965). Foreign entities they control may also be, although they may be subject to the competing jurisdiction of the foreign country In addition, § 203(a)(1)(B) permits the President to "regulate [or] direct and compel . . [the] exercising [of] any right, power, or privilege with respect to . . .any [foreign] property . . " 50 U S C. § 1702(a)(1)(B) This authorizes the President to require a U.S. company to exercise its control over foreign entities in the way the President directs, at least when the direction furthers the purposes of other regulations imposed under the IEEPA.

[100] The definition of the term "severe energy supply interruption" for the purposes of the EECA differs from the definition for purposes of the EPCA (see supra 651). Section 202(1) of the EECA provides that a "severe energy supply interruption" includes a national supply shortage of motor fuel or of any other energy source caused by an "interruption" in energy, including, but not limited to, imported petroleum products, or by sabotage or an act of God. See 42 U.S.C. § 8502(1) (emphasis added). Section 3(8) of the EPCA limits the term to energy shortages resulting from an interruption in the supply of imported petroleum products, or from sabotage or an act of God. 42 U.S.C. § 6202(8)

[101] Section 202(2) of the EECA, 42 U.S.C. § 8502(2), incorporates by reference the definition of the term "international energy program" established by § 3(7) of the EPCA, 42 U S.C. § 6202(7).

"for emergency reduction in the public and private use of each energy source" for which any emergency conservation target is in effect. *Id.* § 8512(a), (b). The President may find inadequate compliance with a target in a state and substitute a federal plan in that state. *Id.* § 8513(b).[102]

If national targets are established for energy sources under the discretionary authority of § 211(a), the President is required to make effective an emergency energy conservation plan for uses by the federal government. 42 U.S.C. § 8511(c).[103]

## F. Export Administration Act of 1979

Under the Export Administration Act of 1979 (EAA), 50 U.S.C. app. §§ 2401–2420 (1982), the President may impose controls on exports, including petroleum products and materials and technology necessary to produce petroleum products, in order, *inter alia*, to further the foreign policy interests of the United States, to protect the economy from a drain of scarce resources, or to obtain leverage against countries that aid terrorists. Section 7(a), 50 U.S.C. app. § 2406(a), authorizes the President to prohibit or curtail the export of any goods subject to the jurisdiction of the United States or exported by any person subject to the jurisdiction of the United States, in order to carry out the policies of the Act. Those policies are broad enough to allow the President to restrict the export of petroleum products in response to a substantial shortage. In relevant part, the Statement of Policy contained in the Act provides:

> (2) It is the policy of the United States to use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary—
>
> *        *        *        *        *
>
> (B) to restrict the export of goods and technology where necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations; and
>
> (C) to restrict the export of goods where necessary to protect the domestic economy from the excessive drain of

---

[102] The Secretary of Energy must approve a state plan unless he finds—

(A) that, taken as a whole, the plan is not likely to achieve the emergency conservation target established for that State .    for each energy source involved,

(B) that, taken as a whole, the plan is likely to impose an unreasonably disproportionate share of the burden of restrictions of energy use on any specific class of industry, business, or commercial enterprise, or any individual segment thereof,

(C) that the requirements of this subchapter regarding the plan have not been met, or

(D) that a measure .    is—

(i) inconsistent with any otherwise applicable Federal law (including any rule or regulation under such law),

(ii) an undue burden on interstate commerce, or

(iii) a tax, tariff, or user fee not authorized by State law.

42 U S.C. § 8512(c)(1).

[103] The Department of Energy has established procedures for the development, submission, and approval of state plans and the standby federal plan 10 C F R Pt 477

scarce materials and to reduce the serious inflationary impact of foreign demand.

*    *    *    *    *

(8) It is the policy of the United States to use export controls to encourage other countries to take immediate steps to prevent the use of their territories or resources to aid, encourage, or give sanctuary to those persons involved in directing, supporting, or participating in acts of international terrorism. To achieve this objective, the President shall make every reasonable effort to secure the removal or reduction of such assistance to international terrorists through international cooperation and agreement before resorting to the imposition of export controls.

*Id.* § 2402(2)(B) & (C), (8). The statute does not, however, contain any authority for the President to impose allocation or price controls with respect to domestically produced or refined crude oil and petroleum.

Section 7 of the EAA also places certain limitations on the export of domestically produced crude oil transported by pipeline over rights-of-way granted by the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. § 1652, and on the export of refined petroleum products. *See* 50 U.S.C. app. § 2406(d), (e). In addition, petroleum products produced from the NPRs (*see supra* at n.33), oil and gas produced from the Outer Continental Shelf, and crude oil transported by pipeline over rights-of-way granted under § 28(u) of the Mineral Lands Leasing Act (MLLA), 30 U.S.C. § 185(u), are made subject, by separate statutes, to the requirements and provisions of the EAA.[104] Section 7(d)(3) of the EAA, 50 U.S.C. app. § 2406(d)(3), specifies that the export restrictions imposed by the Act or by other provisions of law do not apply to exports of oil pursuant to any bilateral international oil supply agreement entered into by the United States before June 25, 1979, or to any country pursuant to the IEP's oil sharing system. Under § 103(c) of the EPCA, 42 U.S.C. § 6212(c), the Export Administration Act may be used to implement restrictions on the export of energy sources, materials or equipment imposed under that section. *See* discussion *supra* at 652.

## G. *Other Statutory Authorities*

### 1. Fuel Switching Authorities

In the event of a petroleum emergency, the President may be able to use authority under several statutes to require fuel switching in order to mitigate the

---

[104] Petroleum products from the NPRs, oil and gas from the Outer Continental Shelf (OCS), and crude oil transported over MLLA rights-of-way, are subject to all of the limitations and licensing requirements of the EAA, except for products that are either exchanged in similar quantities for convenience or increased efficiency of transportation with persons or the government of an adjacent foreign state, or that are temporarily exported for convenience or increased efficiency of transportation across parts of an adjacent foreign state. 10 U.S C. § 7430(3); 43 U.S.C § 1354(a); 30 U.S C § 185(u). The Outer Continental Shelf Lands Act also specifically provides that OCS oil or gas "exchanged or exported pursuant to an existing international agreement" is exempt from the export restrictions of the EAA. 43 U.S.C. § 1354(d). Before any crude oil from the NPRs or any product refined therefrom or crude oil subject to MLLA restrictions may be exported, the President must find, in addition to the requirements imposed by the EAA, that such exports will not diminish the total quality or quantity of petroleum available to the United States and that such exports are in the national interest and are in accord with the EAA. 10 U.S C. § 7430(e), 30 U S C § 185(u)

684

effects of the shortage and reduce dislocations in energy supplies. Fuel switching encompasses two types of emergency authority: (1) authority to prohibit the burning of petroleum or other fuels; and (2) authority to assure access to supplies of alternate fuels by allocation or mandatory interconnections, and possibly to augment available supplies through increased production or curtailed exports.

The President is given the authority to prohibit the burning of particular fuels by power plants and major fuel-burning installations by two statutes. Section 607 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 15 U.S.C. § 717z (1982), authorizes the President to prohibit the burning of natural gas by any electric power plant or major fuel-burning installation. Exercise of this authority depends on a finding by the President of the existence or imminence of a severe natural gas emergency that will endanger the supply of natural gas for high-priority uses. Section 404(b) of the Powerplant and Industrial Fuel Use Act (FUA), 42 U.S.C. §§ 8301–8484 (1982), empowers the President to prohibit the use of petroleum or natural gas as a primary energy source by any electric power plant or major fuel-burning installation. Exercise of this authority requires a finding of a severe energy supply interruption, as that term is defined in the EPCA (*see supra* at 6). *See* 42 U.S.C. § 8374(b).

In addition to prohibiting the use of a particular fuel during an emergency, the President would have the authority under various statutes to assist the recipients of prohibition orders in obtaining alternate fuel supplies. During severe energy supply interruptions as defined in the EPCA, the President could allocate and require the transportation of coal for the use of any electric power plant or major fuel-burning installation, pursuant to § 404(a) of the FUA, 42 U.S.C. § 8374(a). Section 202(c) of the Federal Power Act (FPA), 16 U.S.C. §§ 791a–828c (1982), would allow the Department of Energy to order the temporary interconnection of facilities, and such generation, delivery, interchange, transmission, or power wheeling of electric energy as in its judgment would best meet the emergency. *See* 16 U.S.C. § 824a(c). In addition, under § 210 of the FPA, 16 U.S.C. § 824i, the Federal Energy Regulatory Commission (FERC) would have the authority to order the physical connection of a cogeneration facility, small power production facility, or transmission facilities of any electric utility with the facilities of any other electric utility, federal power marketing agency, geothermal power producer, qualifying small power producer, or cogenerator. Section 211 of the FPA, 16 U.S.C. § 824j, would authorize the FERC to order electric utilities to provide wheeling transmission services, including any necessary enlargement of transmission capacity, for any other electric utility, geothermal power producer, or federal power marketing agency.

Certain deliveries of natural gas could also be facilitated under the Natural Gas Act (NGA), 15 U.S.C. §§ 717–717z (1982). Section 7 of the NGA, 15 U.S.C. § 717f, authorizes the FERC to order a natural gas company to extend or establish transportation facilities to sell natural gas to local distributors. Pursuant to § 303 of the Natural Gas Policy Act (NGPA), 15 U.S.C. § 3363 (1982), the President may allocate supplies of natural gas during an emergency as defined by § 301 of the NGPA in order to assist in meeting natural gas requirements for high-priority users of natural gas; the definition of an emergency is the same as set forth under

the PURPA, and excludes energy supply emergencies not involving a significant natural gas shortage. *See* 15 U.S.C. §§ 3361, 3363. Section 302 of the NGPA, 15 U.S.C. § 3362, provides that the President's authority to direct interstate pipelines or local distribution companies served by interstate pipelines to contract for the purchase of emergency supplies of gas is limited to an emergency as defined by § 301. Thus, the President's authority under the NGPA to require allocation of natural gas supplies directly to affected users is limited to natural gas emergencies. In the event of a petroleum shortage, that authority therefore would probably not be available, for example, to allocate supplies to users with a dual natural gas and petroleum capability, unless there were also a significant natural gas shortage.[105]

Finally, in addition to incremental production of crude oil or natural gas pursuant to § 106 of the EPCA, 42 U.S.C. § 6214 (*see supra* at 653–54), or export controls on supplies of energy imposed under § 7 of the EAA, 50 U.S.C. § 2406, or § 103 of the EPCA, 42 U.S.C. § 6212 (*see supra* at 683–84, 652–53), domestic energy supplies might also be increased by terminating any export authorizations granted under § 3 of the NGA, 15 U.S.C. § 717b, or § 202(e) of the FPA, 16 U.S.C. § 824a(e).

## 2. Miscellaneous Statutes

A number of other statutes provide the President with selective authority to affect the use or distribution of petroleum products or to take other measures to respond to a petroleum emergency, authority that may be available to respond to a petroleum shortage if the specific triggering requirements of each statute are met. Pursuant to § 36 of the MLLA, 30 U.S.C. § 192, the United States may demand that any royalty accruing to it under an oil or gas lease be paid in oil or gas. The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1982), gives the United States the right of first refusal to purchase OCS oil at market prices during "time of war or when the President shall so prescribe." 43 U.S.C. § 1341(b). Other measures available to the President might include facilitating transportation of petroleum products in times of emergency;[106] modifying air pollution control requirements in times of an emergency to allow efficient use of available energy sources;[107] or providing technical assistance, funds and personnel to states

---

[105] The allocation authority in § 101(a) of the DPA, 50 U.S.C app § 2071(a), could possibly be used in a petroleum emergency to allocate natural gas to defense agencies and contractors for defense needs However, that authority could not be used to allocate natural gas supplies in the civilian market, in the event of a petroleum emergency, unless natural gas were also in short supply and necessary for the needs of national defense, as required by § 101(b), 50 U.S.C app. § 2071(b) *See supra* at 665–66.

[106] Under the Interstate Commerce Act, *as amended*, 49 U S.C. §§ 10101–11901 (1982), the Interstate Commerce Commission could authorize the entry of new motor carriers or water carriers into temporary service if they were needed to ensure movement of essential petroleum products, or could issue priority orders during an emergency situation for rail movement of commodities, including petroleum products. 49 U.S.C. §§ 10928, 11123. The Magnuson Act, 50 U S.C §§ 191–198 (1982), authorizes the Secretary of Transportation to make rules and regulations governing the movement of any vessel within the territorial waters of the United States if the President declares a national emergency to exist by reason of actual or threatened war, insurrection or invasion, or disturbance or threatened disturbance in the international relations of the United States. 50 U S C. § 191.

[107] Section 110(f) of the Clean Air Act, 42 U S C. § 7410(f), permits the temporary modification of a state's air pollution control program upon a presidential finding of a severe national or regional energy emergency.

or to foreign countries in order to minimize the effects of a petroleum shortage.[108]

## II. Legal Bases for Specified Energy Preparedness Activities

Consistent with § 3 of the EEPA, this Part addresses how the statutory authorities outlined in Part I support the enumerated energy emergency preparedness activities of the United States. *See supra* n.2. Since no petroleum emergency is likely to be isolated in cause, effect, or remedy, any or all of the authorities described above may, in the appropriate circumstances, provide some basis for the President to respond in some fashion, directly or indirectly, to a particular crisis. In most petroleum emergencies it is likely that several different statutory authorities would be available to the President. The scope of this discussion is therefore necessarily limited to identifying the primary statutory authorities that provide a basis for the enumerated preparedness activities. Failure to mention other less directly applicable authorities should not be interpreted to suggest that the President could not use such authorities to respond to a particular state of facts, if the requirements of those statutes were met.

### A. Authority to Implement the IEP

The IEP Agreement, adopted in response to the 1973–74 oil embargo, provides a cooperative system designed to reduce the vulnerability of Participating Countries to future supply disruptions and to dependence on imported oil. The IEP was formally adopted by 16 countries in 1974.[109] It was provisionally entered into as an executive agreement by the President. 27 U.S.T. 1685, T.I.A.S. No. 8278 (Nov. 18, 1974). The United States, on January 9, 1976, gave its notification that, having complied with constitutional procedures by obtaining the necessary legislation, it consented to be bound by the Agreement.[110]

### 1. Obligations Imposed by the IEP Agreement

The IEP Agreement imposes four principal substantive obligations on Participating Countries as follows:

---

[108] Under the Disaster Relief Act of 1974, 42 U S.C. §§ 5121–5202 (1982), upon finding that an emergency or major disaster exists, the President could direct any federal agency to utilize its available resources and personnel in support of state and local disaster assistance efforts 42 U.S.C. §§ 5145, 5146. The Foreign Assistance Act of 1961 empowers the President to allow federal agencies to furnish services and commodities on an advance-of-funds or reimbursement basis to friendly countries and international organizations, and to waive certain regulations governing the making, performance, amendment, or modification of contracts and the expenditure of funds by the federal government, if he determines such action to be in furtherance of the purpose of the Act to "support" or "promote economic or political stability" through provision of foreign assistance. 22 U.S.C. §§ 2346, 2357, 2393.

[109] *See Digest of U S Practice in Int'l Law* 560 (1974). Those countries were Austria, Belgium, Canada, Denmark, Ireland, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, Turkey, the United Kingdom, the United States, and West Germany Greece, Iceland, New Zealand, Norway, and Portugal have since consented to be bound by the Agreement.

[110] *See Digest of U.S Practice in Int'l Law* 650 (1975). The enabling legislation was contained in Title II of the EPCA, 42 U S C. §§ 6271–6275, enacted in 1975, Pub. L. No. 94–163, Title II, 89 Stat 871 (1975).

687

### a. Emergency Reserves (Chapter I)

Each Participating Country must maintain emergency reserves equal to 90 days of net oil imports. This commitment may be satisfied by existing oil stocks, including stocks in tankers and pipelines, fuel switching capacity, or standby oil production, to the extent decided by the Governing Board, based on certain determinations and studies required by the Annex to the IEP Agreement.

### b. Demand Restraint (Chapter II)

Each Participating Country must develop or have ready a contingent program of demand restraint measures that will enable it to reduce oil consumption, in the event of activation of the IEP's emergency system (*see infra* at 689).

### c. Oil Sharing (Chapter III)

Each Participating Country is required to take necessary measures to carry out the international allocation of oil among Participating Countries if required by activation of the emergency system (*see infra* at 689). A complex formula provides for calculation of "supply rights" and "allocation rights and obligations" of Participating Countries. This calculation takes into account historic levels of consumption and actual domestic production and net imports available during an emergency, and assumes that each Participating Country will absorb some of the shortfall through the use of demand restraint measures and emergency reserves. *See infra* at ns. 112 & 113.

### d. Information Exchange (Chapter V)

Participating Countries are required to provide or make available to the IEA certain information necessary for monitoring the international supply of petroleum and ensuring the efficient operation of the emergency system. The information system established by the IEP Agreement consists of two sections: (1) a general section, requiring the communication of non-proprietary information on the international oil market and activities of oil companies; and (2) a special section requiring submission of proprietary information necessary to implement emergency measures.[111] Each Participating Country is required to take appropriate measures to ensure that oil companies operating within its jurisdiction make such information available as is necessary to fulfill the information obligations of that member.

---

[111] A critical feature of the special information system is submission by oil companies of certain proprietary information in Questionnaire A and by member governments in Questionnaire B. If there is reason to believe that a serious oil supply disruption may be developing that could reach the 7 percent trigger (*see infra* at 689), the Secretariat, following contact with the member governments, may request submission of those questionnaires by participating oil companies and by member governments. Each member government makes its own decision as to whether or how to allow oil companies to respond. In the United States, this would be accomplished by issuance of an antitrust clearance by the Secretary of Energy, with the concurrence of the Attorney General, pursuant to the regulations and the Voluntary Agreement implementing § 252

## 2. Activation of the IEP Emergency System

The core of the IEP is Chapter IV, which outlines the circumstances that trigger the IEP emergency system. The emergency system may be triggered when one or more Participating Countries sustains or is likely to sustain an oil supply shortfall of more than 7 percent, measured against final oil consumption during a specified base period. The IEP provides for both a "selective" and a "general" trigger. A selective trigger may be declared if one or more Participating Countries suffers a 7 percent or greater shortfall.[112] In the event of a selective trigger, countries may meet their allocation obligations by any measure of their choosing, including demand restraint measures or the use of emergency reserves. A general trigger may be declared only if the Participating Countries as a whole suffer at least a 7 percent reduction in oil supplies. Declaration of a general trigger activates the supply rights and allocation rights and obligations of Participating Countries as calculated according to Chapter III, and does not allow the same flexibility to choose emergency measures that is permitted under a selective trigger.[113]

Article 22 of Chapter IV of the IEP Agreement also provides that the Governing Board may decide, by unanimous vote, to "activate any appropriate emergency measure not provided for in this Agreement, if the situation so requires."[114]

## 3. Statutory Authority to Implement the IEP Agreement

To the extent that statutory authority is required for or relevant to implementation of the obligations of the United States under the IEP, that authority is provided primarily by the EPCA and Title II of the EECA.[115] We address here the scope of that authority with respect to the various obligations created by the IEP Agreement.

---

[112] A selective trigger may be initiated by a request from an affected country or countries to the Secretariat of the IEA. If the Secretariat makes a positive finding that a 7 percent shortfall exists or is imminent, activation occurs and emergency measures are implemented within 15 days, unless within 6 days after the Secretariat's finding the Governing Board, by a weighted majority vote, decides not to activate the system or to require only partial activation. If within 72 hours of the initial request the Secretariat does not make a positive finding, the country may request the Governing Board to consider the situation. The Governing Board must meet within 48 hours, and within an additional 48 hours must make its finding whether the requisite shortfall exists If it does so find, it must decide whether to activate emergency measures If a selective trigger is declared, the country requesting that action must absorb the first 7 percent of the shortfall Once that country has absorbed that amount of the shortfall, it has an allocation right equal to the amount of the shortfall above 7 percent. The other Participating Countries share the obligation to satisfy this allocation right on the basis of their consumption during a specified base period.

[113] The procedure for activation of the general trigger is the same as for a selective trigger. See supra n 112 In the event of an overall 7 percent or greater shortfall, each Participating Country has a supply right equal to its base period final consumption, after deducting required demand restraint and emergency reserve drawdown amounts. If a country's supply right exceeds the sum of its available domestic production and net imports during an emergency, it has an allocation right that entitles it to additional net imports from the other Participating Countries equal to that excess If a country's available domestic production and net imports during an emergency exceed its supply right, it has an allocation obligation that requires it to supply other Participating Countries, directly or indirectly, with a quantity of oil equal to that excess

[114] The scope of Article 22 is subject to some debate See infra n 133.

[115] Other statutes may also provide authority with respect to petroleum products and emergency preparedness activities that could be used by the President in connection with IEP activities if the particular requirements of those statutes are met. Those authorities are discussed below in connection with the authority for participation in "subcrisis" IEP activities. See infra at 692–97

689

### a. Emergency Reserves

Under Chapter I of the IEP Agreement, a Participating Country's emergency reserve obligation may be met, *inter alia,* by private stocks of petroleum products. We have been informed by the Department of Energy that the level of private stocks maintained by U.S. companies has been and is expected to be sufficient to meet that obligation. We note that certain provisions of the EPCA and other statutes give the President discretionary authority that could be used to establish or draw down petroleum product reserves, if the President were to determine that such actions would be appropriate under the IEP Agreement and met the conditions otherwise specified in those statutes. For example, the President has discretionary authority to implement an IPR (*see supra* at 655), and to use reserves in the SPR in fulfillment of "obligations of the United States under the international energy program" (*see supra* at 655–56). The IEP Agreement also provides that a Participating Country's emergency reserve obligation may be met by fuel switching authorities or standby oil production, to the extent decided by the Governing Board.[116] Other relevant statutory authorities may therefore include the fuel switching authority granted under various federal statutes,[117] and the authority under § 106 of the EPCA, 42 U.S.C. § 6214, and 10 U.S.C. § 7422(b), to accelerate production of crude oil and natural gas on federal and state lands or petroleum products from the NPRs.[118]

We wish to emphasize, however, that the President's authority under those statutes is discretionary, and that any action taken would have to be in accordance with the specific terms of those statutes. No statute requires the President to take particular actions, or to use particular reserves, in order to implement the emergency reserve obligation of the United States under Chapter I of the IEP Agreement.

### b. Demand Restraint Measures

Statutory authority for establishment of a contingent demand restraint program as required by Chapter II of the IEP Agreement is available under §§ 201 and 202 of the EPCA, 42 U.S.C. §§ 6261 & 6262, providing for establishment and implementation of federal energy conservation contingency plans,[119] and Title II of the EECA, 42 U.S.C. §§ 8501–8541 (1982), directing the development of state energy conservation contingency plans.[120] These plans may be implemented upon a discretionary presidential finding that they are necessary "to fulfill obligations of the United States under the international energy program."[121] Demand restraint could also be accomplished or facilitated by restricting supplies

---

[116] We have been informed by the Department of Energy that the Governing Board has not yet taken action to determine the extent to which the emergency reserve commitment may be satisfied by oil stocks, fuel switching capacity, and standby production

[117] *See supra* at 685–87

[118] *See supra* at 653–54 & n.33.

[119] *See supra* at 656–57.

[120] *See supra* at 682–83.

[121] *See supra* at 682.

of petroleum products through the TEA,[122] or by relying on market forces to dampen demand. In addition, the IEP Agreement allows a Participating Country to substitute reserves held in excess of its emergency reserve commitment for demand restraint measures.

### c. Oil Sharing

Section 252 of the EPCA, 42 U.S.C. § 6272, allows domestic oil companies to participate in meeting the allocation obligations of the United States under the IEP by establishing a framework for cooperation and by providing an antitrust defense for actions taken in accordance with those plans.[123] If necessary, such voluntary actions may be supplemented by mandatory regulation under § 251, which provides the President with authority to take actions necessary to fulfill obligations of the United States under the allocation provisions of the IEP, as set forth in Chapters III and IV of the Agreement. As discussed above, the President's authority under § 251 encompasses the authority to require companies subject to the jurisdiction of the United States to divert oil supplies to other Participating Countries in satisfaction of the United States' allocation obligations, and to establish a domestic "fair sharing" program of allocation among oil suppliers as necessary to ensure successful implementation of the IEP emergency system.[124] The authority provided in §§ 251 and 252 with respect to fulfillment of allocation obligations of the United States is available only if the emergency system has been activated in accordance with the requirements of Chapter IV of the Agreement.[125]

### d. Information Exchange

Sections 254 and 252 of the EPCA, 42 U.S.C. §§ 6274 & 6272, establish procedures by which the United States may meet its obligations to provide information to the IEA. Section 254 authorizes the Secretary of State to provide to the IEA information and data related to the energy industry that is required to be submitted under the IEP.[126] The provisions of § 252 governing cooperation among and the antitrust defense for domestic oil companies (*see supra* at 660–62), as implemented by the applicable regulations, Voluntary Agreement, and Plan of Action, govern the supplying by oil companies of information required under Chapter V of the IEP Agreement and the availability of the antitrust defense for such activities. As implemented, the antitrust defense

---

[122] As with the President's authority with respect to emergency reserves (*see supra* at 690), implementation of such plans is a discretionary decision.

[123] *See supra* at 660–62.

[124] *See supra* at 659–60.

[125] *See infra* at 693–94

[126] This information may include data supplied by oil companies to the Department of Energy for transmission to the IEA, or data collected by the Department of Energy pursuant to other statutory authority, such as the Energy Supply and Environmental Coordination Act, 15 U S.C § 796, and the Federal Energy Administration Act, 15 U.S C. § 772. Such information may be transmitted by the Department of Energy to the Department of State, for transmission to the IEA upon certification by the Secretary of State that the information is required to be submitted under the IEP *See* 42 U S C. § 6274(a), (d).

generally covers participating U.S. company advice and consultations in IEA meetings and system tests. If confidential, proprietary data is to be furnished or exchanged prior to activation of the IEP emergency system, § 5(b)(2) of the current Voluntary Agreement requires the prior approval of the Secretary of Energy, after consultation with the Secretary of State, and the concurrence of the Attorney General, after consultation with the FTC.[127] When the emergency system has been activated, § 5(b)(3) of the Voluntary Agreement confers anti-trust protection, without the need for further clearance, with respect to the provision or exchange of "such types of confidential or proprietary information as are reasonably required to implement" the Voluntary Agreement and approved plans of action.[128]

### 4. December 10, 1981, Decision of the Governing Board with Respect to Subcrisis Activities

On December 10, 1981, the Governing Board of the IEA adopted by unanimous vote a "Decision on Preparation for Future Supply Disruptions" outlining a basis for consultation among Participating Countries in the event of a so-called "subcrisis" situation—*i.e.*, a disruption in oil supplies short of the 7 percent trigger required to activate the emergency system. The preamble to the Decision reflects that it is based on the following considerations:

> —disruptions in oil supply which did not reach the 7 percent level required to trigger the emergency allocation system have recently caused and could again cause damage to Member country economies through sharp oil price increases;
> —IEA countries should be better prepared to contribute to preventing a disruption in oil supply from again resulting in sharply higher prices and severe economic damage;
> —allowing market forces to operate and strengthening them where possible will improve the balance between supply and demand and the distribution of oil in short supply;
> —supplementary action by governments may be necessary in those areas where market forces do not sufficiently counteract the adverse impact of supply disruptions;
> —when such action is determined to be necessary, it should be light-handed and flexible in responding to the specific situation

---

[127] Section 5(b)(2) of the current Voluntary Agreement (*see* 41 Fed. Reg 14000 (Apr 1, 1976)) requires the prior approval of the Secretary of Energy, with the concurrence of the Attorney General, for any transmittal or exchange of confidential or proprietary information or data by oil companies to the IEA or to each other Company-specific (*i.e.*, disaggregated data) must be aggregated by the Department of Energy or the IEA prior to disclosure to others, unless the Secretary of Energy, after consultation with the Secretary of State and with the concurrence of the Attorney General, "has determined that such exchange or disclosure is necessary to develop, prepare, or test emergency allocation measures."

[128] The companies are required to notify the Department of Energy, the Attorney General, and the FTC of the types of information and data provided The Secretary of Energy, after consultation with the Secretary of State, the Attorney General, and the FTC, may prescribe terms and conditions for the continued exchange or provision of information or data in an emergency situation *See* 41 Fed Reg. 14000 (Apr. 1, 1976)

at hand and at the same time be taken promptly and effectively; . . . .

The December 10, 1981, Decision provides for monitoring by the IEA of oil markets in order to assess the nature and probable impact of future supply disruptions;[129] requires the Participating Countries to consult with each other and with the Secretariat in the event of a "subcrisis" supply disruption in order to refine the Secretariat's assessment of the supply, demand, and stock situation; and provides that in the event of a "subcrisis" supply disruption the Governing Board will meet to decide what action, if any, is necessary to meet the situation. The Decision lists several illustrative measures that could be considered by the Board in that event, such as discouragement of abnormal spot market purchases or other undesirable purchases, lowered consumption, short-term fuel switching, high levels of indigenous production, changes in stocks and stock policies, and informal efforts to minimize and contain the effects of supply imbalances. The Decision specifically recognizes that "detailed methods of implementation [of any such measures] will be decided by governments in accordance with national law and the IEP, and could vary from country to country while aimed at achieving the overall result desired on an integrated basis." It specifies further that consultation with oil companies concerning any measures that might later be agreed to would be undertaken by the governments having jurisdiction over those companies.

The United States voted in favor of the December 10, 1981, Decision and made the following statement explaining its interpretation of the effect of the Decision:

> The United States . . . welcomes this Decision. At the same time we must state for the record our understanding of it. The United States remains committed to reliance on free market forces as the most effective response to supply disruptions. We are pleased to note the inclusion of this thought in the preamble of the Decision as a guiding principle for IEA discussions of market disruptions. The Decision establishes a basis for future IEA consultations in the event of subtrigger supply disruptions. However, it does not commit IEA countries in advance as to the specific actions which they might take in such circumstances. Moreover, we note the fact that any actions taken in response to future disruptions must be consistent with national law and the Agreement on an International Energy Program, and may vary from country to country.

As this statement recognizes, the December 10, 1981, Decision of the Governing Board does not impose any mandatory obligations on the United States or on any other Participating Country to take particular actions in a "subcrisis"

---

[129] Specifically, the Decision states that the Executive Director of the IEA may, after consultations with Participating Countries, activate submission of Questionnaires A and B "consistent with procedures established for the emergency allocation system" in the event of a supply disruption.

situation. Rather, it provides only a requirement for future IEP consultations in the event of a "subcrisis" supply disruption.[130] The text of the Decision makes clear that it does not commit IEP countries in advance to particular actions they might take in responding to such situations. Therefore, the Decision itself has no independent legal significance, and presents no legal issue with respect to the President's authority to take steps to implement the Decision.

The December 10, 1981, Decision contemplates, however, that the Governing Board may decide on specific actions in the future, in the event of a particular "subcrisis" supply disruption. It is difficult to speculate as to what authority the President (or participating oil companies) would have to implement any future decision of the Governing Board in a "subcrisis" supply disruption, as that analysis would necessarily depend on the details of the action taken by the Governing Board. The December 10, 1981, Decision suggests that primary reliance would be placed on the operation of market forces to improve the supply/ demand imbalance and to equalize the distribution of oil in short supply, and on informal, non-mandatory efforts by Participating Countries to strengthen those market forces. These efforts could include, for example, increased informal consultation among Participating Countries and between Participating Countries and oil companies subject to their jurisdiction, and public appeals by member governments for voluntary measures such as demand restraint, use of alternate fuels, increased indigenous production, and use of private reserve stocks. Implementation of informal measures such as these by the President would not require particular emergency statutory authority.[131]

Questions about the scope of the President's statutory authority and the authority of individuals and oil companies to cooperate voluntarily would arise if, in a "subcrisis" supply disruption, the Governing Board were to adopt mandatory measures requiring specific types of "supplementary action" by Participating Countries. See Preamble to December 10, 1981, Decision.[132] Presidential authority to implement a "subcrisis" decision of the Governing Board that imposes mandatory obligations may be available, depending on the circumstances, under certain of the statutory authorities described in Part I above.

However, a significant limitation on the President's authority to take action for the purpose of implementing allocation of oil supplies required by a "subcrisis" decision of the Governing Board, and on the ability of oil companies to cooperate voluntarily in such allocation, is imposed by §§ 251 and 252 of the EPCA, 42

---

[130] The Decision does contain provisions concerning the monitoring of oil markets by the Secretariat and activation of the Questionnaire A and B systems These provisions, however, are specifically limited to the procedures established by the IEP Agreement, and therefore do not expand the existing obligations of Participating Countries under that Agreement.

[131] As we discuss *infra*, however, no statutory antitrust defense would be available for private individuals and companies with respect to voluntary actions taken in response to such efforts.

[132] Any such actions, if they purport to impose new or additional obligations on Participating Countries, would have to be taken by unanimous vote of the Governing Board. See Art. 61.1(b) (decisions which impose new obligations on Participating Countries that are not already specified in the Agreement must be by unanimous vote).

694

U.S.C. §§ 6271 & 6272.[133] Under existing statutes, the President has no authority to direct allocation of petroleum products for the purpose of fulfilling allocation obligations imposed by the IEP, and oil companies have no antitrust defense with respect to voluntary actions to meet those allocation obligations, except as provided in §§ 251 and 252 of the EPCA. *See* 42 U.S.C. § 6271(c)(2);[134] *id.* § 6272(a).[135] As was made clear by the amendments to §§ 251 and 252 added in 1982 by the EEPA,[136] those sections do not apply to "subcrisis" activities, even if directed by the Governing Board pursuant to Article 22.[137] We believe Senator McClure's statements in debate on the amendatory provisions of the EEPA are dispositive on that point:

> The argument has been made that article 22 confers authority on the IEA Governing Board to trigger an allocation system during a subcrisis situation, and that the section 252 antitrust defense would then be applicable to U.S. oil company participation in the allocation program. This argument is incorrect, section 252 would not apply in that situation.
>
> By amending sections 251 and 252 as I have proposed, we would hopefully avoid misinterpretations of those provisions by future administrations here in the United States, by other IEA countries, or by the IEA itself. We would thus insure that the authority conferred by sections 251 and 252 will apply only to crisis situations—those involving at least a 7-percent shortfall— in accordance with the intent of the Congress.

128 Cong. Rec. S 6065 (daily ed. May 26, 1982) (remarks of Sen. McClure). Thus, § 251 would provide no authority for the President to direct any allocation

---

[133] This analysis assumes that the Governing Board could require some limited sharing of oil stocks or supplies in a "subcrisis" situation We note, however, that a question exists whether the Governing Board could require any mandatory oil sharing in any supply disruption short of the 7 percent "trigger." The emergency measures provided for in the IEP Agreement, including mandatory demand restraint measures under Chapter II and allocation of oil under Chapter III, can be activated only "in accordance with [Chapter IV] " *See* Chap IV, Art 12 Article 22 of Chapter IV prqvides that the Governing Board may unanimously, at any time, "activate any appropriate emergency measures not provided for in the Agreement, if the situation so requires." It is debatable whether this general language in Article 22 allows the Governing Board to circumvent the carefully circumscribed and negotiated provisions of Chapters II, III, and IV, which link demand restraint obligations and allocation rights and obligations directly to the existence of a 7 percent shortfall in oil supplies of one or more Participating Countries. It is arguable that the reference in Article 22 to "appropriate emergency measures *not provided for in the Agreement*" (emphasis added) means that Article 22 contemplates emergency measures *other than* mandatory demand restraint and allocation requirements, which are already provided for in the Agreement

[134] "No officer or agency of the United States shall have any authority, other than authority under this section [*i.e.*, § 251], to require that petroleum products be allocated to other countries for the purpose of implementation of the obligations of the United States under the international energy program."

[135] "Effective 90 days after December 22, 1975, the requirements of this section [*i.e.*, § 252] shall be the sole procedures applicable to—
(1) the development or carrying out of voluntary agreements and plans of action to implement the allocation and information provisions of the international energy program, and
(2) the availability of immunity from the antitrust laws with respect to the development or carrying out of such voluntary agreements and plans of action."

[136] *See supra* at 660

[137] The United States, as a member of the Governing Board, would be able to veto any proposed decision that would require such allocation.

of oil for the purpose of implementing a Governing Board decision in a "sub-crisis,"[138] and § 252 would provide no authority or antitrust defense for oil companies to participate in such an allocation.[139]

To the extent that any mandatory "subcrisis" measures adopted by the Governing Board would require the President to take particular implementing actions other than the allocation of oil, the President's authority would derive from existing statutory authorities other than §§ 251 and 252 of the EPCA. Such authorities may include, for example, other provisions of the EPCA and Title II of the EECA that may be used to fulfill the United States' "obligations under the [IEP]"—*i.e.*, §§ 151–161, 201–202, and 254 of the EPCA, 42 U.S.C. §§ 6231–6241, 6261–6262, 6274, and Title II of the EECA, 42 U.S.C. §§ 8501–8541.[140]

Additional authority might be available under other statutory authorities described in Part I above, if domestic circumstances were to provide an adequate basis for use of those authorities. For example, an international disruption in the supply of petroleum products may result in an interruption in the supply of imported petroleum products in the United States of sufficient length and severity to trigger a "severe energy supply interruption." This would make available to the President, for example, the authority in § 106 of the EPCA, 42 U.S.C. § 6214, to require accelerated rates of production of crude oil on fields located on designated federal and state lands,[141] and the authority in § 404(b) of the FUA, 42 U.S.C. § 8374(b), to prohibit the use of natural gas or petroleum in power plants and other major fuel-burning installations.[142]

Likewise, in the event of an international shortage in petroleum products that did not reach the "trigger" level, the President could determine that the shortage would affect the national defense preparedness of the United States and therefore use the authorities in the DPA relating to priority performance of contracts, allocation of materials and facilities, and activation of the Executive Reserve, in accordance with the specific requirements of those provisions.[143] In addition, a presidential declaration of an emergency under the IEEPA, if the circumstances

---

[138] In addition, the waiver provision in § 7(d)(3) of the EAA, 50 U.S.C app § 2406(d)(3), would not be available unless the IEP emergency system had been activated *See supra* at 683–84.

[139] Section 252 also limits the availability of an antitrust defense with respect to the furnishing and exchange of information by oil companies pursuant to the provisions of Chapters IV and V of the Agreement.

[140] Arguably, a unanimous decision by the Governing Board requiring specific actions by Participating Countries would impose "obligations" on the United States "under the [IEP]" within the language of those provisions. Article 66 of the IEP Agreement provides that the Participating Countries "*shall take* the necessary measures . to implement the Agreement and *decisions taken by the Governing Board*" (emphasis added). In the absence of persuasive legislative history to the contrary or specific limiting language, such as exists with respect to §§ 251 and 252, the authority in §§ 151–161, 201–202, and 254 of the EPCA, and Title II of the EECA might be interpreted to extend to all "obligations" of the United States under the IEP, including mandatory measures required by a unanimous decision of the Governing Board. Whether decisions taken in this manner constitute IEP "obligations" within the meaning of those provisions, however, may be subject to some debate Because of the unanimity required by Article 61 1(b), no such "obligations" could be imposed on the United States without its consent Moreover, this conclusion could not apply to substantive amendments to the IEP Agreement after 1974, which are excluded from the definition of the IEP for purposes of the EPCA. *See supra* at n 28.

[141] *See supra* at 653–54

[142] *See supra* at 685

[143] *See supra* at 662–680. The President could use the authority in § 101(c) of the DPA, 50 U S C app. § 2071(c), to allocate materials and supplies in order to maximize energy production, without making the finding of a national defense nexus required by other sections of the Act

696

of an international supply disruption met the threshold requirements established by that Act, would trigger presidential authority to control disposition of property in which a foreign country or national has an interest.[144]

However, the President could not use statutory allocation authority, for example, under the IEEPA, to require the international allocation of petroleum products among Participating Countries solely to implement a "subcrisis" decision of the Governing Board that requires Participating Countries to participate in an oil sharing plan.[145] In addition, no antitrust defense would be available under § 708 of the DPA for any voluntary international allocation made by oil companies to support implementation of such a "subcrisis" decision. See 50 U.S.C. app. § 2158(a)(o); 42 U.S.C. § 6272(a), discussed supra at 70–72.

### 5. National Emergency Sharing Organization

The term National Emergency Sharing Organization (NESO) refers to the agency or entity within each IEP Participating Country that is responsible for general liaison with the IEA on matters of international oil allocation during an emergency and for national oil emergency matters. Authority for the President to establish a NESO or to provide that the functions of a NESO be performed by an existing agency or department within the government stems from 3 U.S.C. § 301 and congressional implementation of provisions of the IEP Agreement in the EPCA and the EECA. By executive order the President has designated the Department of Energy to function as the NESO for the United States. See Exec. Order No. 11,912, 3 C.F.R. 114 (1976), as amended by Exec. Order No. 12,038, 3 C.F.R. 136 (1978), and Exec. Order No. 12,148, 3 C.F.R. 427 (1979).

### 6. Emergency Sharing System

The "emergency sharing system" is a term that has been used to refer to those obligations as set forth in the IEP Agreement that may be triggered in the event of a 7 percent or greater shortfall in petroleum supplies of one or more Participating Countries. Authority for implementation by the United States of those obligations is discussed supra at 690.

---

[144] See supra at 680–84.

[145] This conclusion assumes that the sole purpose for the President's decision to order such allocation would be to implement a "subcrisis" decision by the Governing Board imposing mandatory oil sharing requirements, and that the allocation would therefore be "for the purpose of implementation of the obligations of the United States under the [IEP]," within the meaning of § 251(c)(2), 42 U.S.C. § 6271(c)(2), quoted supra at n.134. By the express terms of that section, the only statutory authority available to the President in those circumstances would be § 251, which, as noted above, provides no allocation authority in "subcrisis" situations. See supra at 694. However, factors taken into consideration by the IEP Governing Board in responding to a "subcrisis" situation may, of course, also be taken into account by the President in his determination whether or how to exercise statutory authorities other than § 251, such as the IEEPA, together with additional considerations, including the impact of the oil shortage on the security, foreign policy, and economy of the United States. See, e.g., 50 U.S.C. § 1701 We therefore do not suggest that, if the Governing Board were to impose oil sharing obligations on Participating Countries in a "subcrisis" situation, the President could not, independent of that decision, exercise authority under the IEEPA to require the allocation of petroleum products, consistent with the specific terms of the IEEPA.

## 7. Supply Rights Project

The supply rights project is a study being undertaken by the Department of Energy to determine what options, such as import quotas or tariffs, may be implemented to reduce or eliminate the likelihood that the United States will incur an allocation obligation if the emergency system is triggered. The project is being conducted pursuant to functions delegated to the Department of Energy under the Department of Energy Organization Act, 42 U.S.C. §§ 7101–7375, and 3 U.S.C. § 301. *See* Exec. Order No. 11,912, *supra*.

### B. Authority to Fulfill NATO Obligations

Pursuant to its obligations under the North Atlantic Treaty, 63 Stat. 2241, the United States may in some circumstances be obligated to participate in distribution of available oil supplies among members of the North Atlantic Treaty Organization (NATO) to satisfy the defense needs of NATO during a petroleum shortage. Two organizations within NATO have responsibility with respect to petroleum emergencies: (1) the Petroleum Planning Committee, which has the task of developing plans for the distribution of available oil supplies among NATO members if there are supply shortages during times of crisis or war; and (2) the NATO Wartime Oil Organization, which is NATO's emergency petroleum organization.

The primary statutory authorities that would allow the President to fulfill responsibilities to NATO countries include the DPA,[146] the IEEPA,[147] the TWEA,[148] and the Foreign Assistance Act of 1961.[149] Some limitation on the President's flexibility is imposed by export restrictions imposed by the EAA and other statutes, which limit the availability of waivers of restrictions on the export of crude oil pursuant to the North Atlantic Treaty.[150] No statutory antitrust or breach-of-contract defense is available for voluntary participation by U.S. oil companies in NATO oil planning or sharing activities.[151]

### C. Authority with Respect to Development and Use of the SPR

The legal authorities with respect to establishment, filling, and drawdown of the SPR are discussed *supra* at 654–656.

---

[146] *See supra* at 662–78.

[147] *See supra* at 680–84.

[148] *See supra* at n 95.

[149] *See supra* at n 108

[150] The EAA provides for waiver of export controls on crude oil required by the Act or by other acts only for exports "pursuant to a bilateral international oil supply agreement entered into by the United States with such nation before June 25, 1979, or to any country pursuant to the International Emergency Oil Sharing Plan of the International Energy Agency," which would not include exports to fulfill NATO responsibilities 50 U.S.C. app. § 2406(d)(3). *See supra* at 685.

[151] *See supra* at 660–62, 672. Protection generally would be available, however, for actions by oil companies required by government orders under those Acts. *See, e g.*, 50 U.S.C. app. § 2157 (no person shall be held liable for an act "resulting directly or indirectly from compliance" with orders issued pursuant to the DPA), 50 U.S.C. § 1702(a)(3) ("[n]o person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, [the IEEPA], or any regulation, instruction, or direction issued under [the IEEPA]"), 50 U.S C. app. § 5(b)(2) (TWEA)

## D. *Authority for Government Incentives to Encourage Private Petroleum Product Stocks*

No statutory authority currently exists that would authorize specific government incentives, such as federal subsidies, loan guarantees, tax credits, or the establishment of quasi-governmental corporations to purchase and hold stocks, to encourage build-up in private petroleum product stocks. Incentives for the build-up of such stocks may, of course, be provided as a matter of policy within statutory constraints, for example, by removing market disincentives for increases in private stocks. Voluntary agreements under the DPA could possibly be used, consistent with the requirements of that Act, to facilitate the building of private stocks if necessary to promote the national defense or national defense preparedness. Participants would receive a limited antitrust defense for their participation. *See supra* at 670–72.

## E. *Authority for Reactivation of the Executive Reserve*

The legal authorities with respect to establishment and activation of the Executive Reserve are discussed *supra* at 672–78.

## F. *Authority for Coordination with State and Local Governments*

In response to initiatives at the federal, state, and local levels, most of the states have taken action to facilitate planning for or responding to energy emergencies. Cooperation between state and local governments and federal agencies in planning for energy emergencies is specifically authorized by §§ 201 and 202 of the EPCA, 42 U.S.C. §§ 6261 & 6262, and by Title II of the EECA, 42 U.S.C. §§ 8501–8541.

State energy emergency response statutes, regulations, and plans differ considerably in their scope and applicability. Powers available under state emergency statutes range from broad grants of authority to state governors under general state disaster acts[152] to specific provisions enumerating actions that may be taken in response to an energy emergency, such as establishment of allocation, rationing, distribution, and conservation plans,[153] and setting up of state agencies to implement those option plans. State energy emergency contingency plans developed by several states provide for a range of actions in the event of an energy emergency, including public information and education programs; incentives to increase local production of energy; allocation, rationing, and distribution programs; transportation conservation measures; electricity restraints; and restrictions on retail operations or gasoline purchases. The definition of an energy

---

[152] *See, e g ,* Alaska Stat. §§ 26.23 010–26 23.230 (1981); Ill. Ann. Stat Ch 127 §§ 1101–1127 (1981); Va. Code §§ 44–146.13–44–146 28 (1981).

[153] *See, e.g.,* Cal. Public Resources Code §§ 25700–25705 (West 1977); Kan. Stat. Ann §§ 74–6801–09 (1980); Md. Natural Resources Code Ann. § 11–102 (Supp. 1981); Tenn. Code Ann. §§ 58–2–101–58–2–132 (1980).

emergency sufficient to trigger implementation of such authorities also differs from state to state.[154]

The major legal issue we address here with respect to the establishment or implementation of state energy emergency responses is whether or under what circumstances a state law, regulation, or plan may be subject to challenge on the ground that it is preempted by federal law or is an undue burden on interstate commerce. This issue is particularly difficult to analyze in the abstract. There are no mechanical tests to determine if particular state legislation or regulation is impermissible. Resolution of that issue depends on a case-by-case comparison of the applicable federal and state provisions and programs, and an analysis of the effect of the competing state and federal regulation in a specific fact situation. Given the diversity of both federal and state authorities related to energy emergency preparedness, it is impossible here to do more than outline the general principles that should govern that analysis.

1. Preemption of State Laws and Regulations

Pursuant to the Supremacy Clause of the Constitution (Art. VI, cl. 2),[155] state laws or regulations may be invalid if they operate in the same field or regulate the same subjects as federal laws or regulations. The determination whether particular state laws or actions taken pursuant to those laws are preempted depends on the purpose and nature of federal regulation in that field and the interaction of state regulation with federal regulation. The underlying task is to determine whether Congress intended, in a particular instance, to preempt state regulation of the same subject matter. *See Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978); *Retail Clerks* v. *Schermerhorn*, 375 U.S. 96, 103 (1963).

Occasionally, Congress explicitly defines the extent to which a particular statute preempts state law. *See generally Jones* v. *Rath Packing Co.*, 430 U.S. 519, 530–31 (1977). Section 6(b) of the EPAA, for example, provided that a regulation or order issued under the Act "shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any state or local government if such provision is in conflict with such regulation or any such order." 15 U.S.C. § 755(b) (1976) (expired Sept. 30, 1981). Another example may be found in § 526 of the EPCA, which provides that:

> No State law or State program in effect on [the date of enactment of this Act], or which may become effective thereafter, shall be superseded by any provision of subchapter I or II of this chapter or any rule, regulation, or order thereunder, except insofar as such State law or State program is in conflict with such provision, rule, regulation, or order.

---

[154] *Compare* Hawaii Rev. Stat Chap. 125C (1976) *with* Wash Rev. Code § 43.21G (1972); Mont. Code Ann §§ 90–4–301–319 (1979), *and* Tenn. Code Ann. §§ 58–2–101–58–2–132 (1980).

[155] "The Constitution, and the laws of the United States . . .; and all Treaties . shall be the Supreme Law of the Land."

42 U.S.C. § 6396.[156]

In most cases, however, preemption must be inferred. The general rule is that stated in *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132 (1963):

> The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.

373 U.S. at 142 (citation omitted). This test was reaffirmed in two of the Court's 1981 decisions. *See Commonwealth Edison* v. *Montana*, 453 U.S. 609, 634 (1981); *Chicago & North Western Transportation Co.* v. *Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981). Preemption may be found if Congress has occupied an entire field of interstate commerce, leaving no room for state legislation;[157] if the state legislation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress;"[158] or if state legislation is inconsistent with specific provisions of a federal statute or regulation.[159]

The clearest examples of state energy emergency laws or regulations that may be subject to challenge under the preemption doctrine would be laws or regulations that actually conflict with federal statutes or directives. For example, a state allocation regulation that requires an oil supplier to take actions inconsistent with effective federal allocation regulations implemented under the EPCA or the DPA would fall under the Supremacy Clause. A determination whether particular provisions of state emergency energy laws, regulations, or plans conflict with federal requirements can be made only by comparing these competing requirements. That comparison cannot be made in the abstract. The "relationship between state and federal laws" must be considered "as they are interpreted and applied, not merely as they are written." *Jones* v. *Rath Packing Co., supra*, 430 U.S. at 526 (citations omitted). Since the scope and effect of both federal and state regulation in the event of an emergency will depend largely on the circumstances of that emergency and the choices made by the appropriate state and federal officials in response to that emergency, a determination whether particular state laws or regulations conflict with federal directives in all likelihood cannot be made unless and until an emergency exists and those authorities are exercised.

The basis for a preemption challenge to state laws or regulations would be more tenuous if the state enactment did not conflict directly with a particular

[156] Even under statutes such as the EPAA and the EPCA, in which Congress makes its intent express with respect to the scope of preemption, a further determination must be made on a case-by-case basis as to whether particular state regulation is "in conflict with" federal provisions. *See, e.g., Mobil Oil Corp* v. *Dubno*, 492 F. Supp. 1004 (D Conn. 1980), *Atlantic Richfield Co.* v. *Tribbitt*, 399 A.2d 535, 545–46 (Del Ch 1977), *New York State Office of Parks & Recreation* v. *Vantage Petroleum Corp.*, 431 N Y.S.2d 779 (N Y Sup. Ct. 1980), *New England Petroleum Corp.* v. *County of Suffolk*, 383 N Y.S.2d 405 (N.Y. App Div. 1976).

[157] *See, e.g., Campbell* v. *Hussey*, 368 U.S 297 (1961)

[158] *See Hines* v. *Davidowitz*, 312 U S 52, 67–68 (1941)

[159] *See, e g , Jones* v *Rath Packing Co.*, 430 U.S. 519 (1977); *Warren Trading Post Co.* v *Arizona Tax Commission*, 380 U.S 685 (1965).

701

federal directive, but rather conflicted only with a general federal policy. Recently, in *Commonwealth Edison Co.* v. *Montana, supra,* the Supreme Court conceded the power companies' point that the EPCA and the FUA were intended to encourage the use of coal. It nevertheless rejected their argument that this purpose preempted a severance tax imposed by Montana on coal mined on federal land, saying:

> [w]e do not . . . accept appellants' implicit suggestion that these general statements demonstrate a congressional intent to preempt all state legislation that may have an adverse impact on the use of coal. . . . In cases such as this, it is necessary to look beyond general expressions of 'national policy' to specific federal statutes with which the state law is claimed to conflict.

453 U.S. at 633–34 (citations omitted).[160] Particularly if the state statute is "an exercise of 'historic police power of the States,'" which would include most state energy emergency laws and regulations, the Supreme Court has refused to find preemption "unless that was the 'clear and manifest purpose of Congress.'" *Florida Lime & Avocado Growers, Inc., supra,* 373 U.S. at 146, quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). The congressional mandate must be "unambiguous," *Florida Lime & Avocado Growers, supra,* 373 U.S. at 147, and "compelling." *New York Telephone Co.* v. *New York State Department of Labor,* 440 U.S. 519, 540 (1979).

In the absence of a relatively direct conflict between state and federal directives, we believe the statutory authorities available to the President to deal with an energy emergency probably would not be interpreted to contain an "unambiguous" and "compelling" mandate to preempt state energy emergency provisions. State laws or regulations are most likely to be vulnerable to a preemption challenge under either the EPCA or the DPA.[161] As noted above, the EPCA specifically saves from preemption all state laws and regulations except those that are in conflict with federal directives. Although the DPA does not contain a comparable savings provision, the breadth of the authorities available to the President under the DPA belies any argument that Congress intended to "occupy the field." The standby authorities provided in the DPA could be invoked in practically any area of the economy, and therefore it is highly unlikely that Congress intended that the states could not act at all in this broad area merely because the President was given broad but discretionary powers under the DPA. That conclusion, however, will depend ultimately on the facts of a particular situation.

---

[160] However, a particular statutory scheme and legislative history could demonstrate that Congress intended to establish uniform national standards or regulations that would foreclose different or more stringent state requirements In that event, state regulation would fall, even if no direct conflict existed between state and federal requirements *See, e.g., Ray* v. *Atlantic Richfield Co.,* 435 U.S. 151, 163–64 (1978)

[161] Most of the other statutory authorities, as described in Part I, deal with subjects that are generally outside the scope of a state's authority to regulate, such as exports and imports *See, e g ,* § 232 of the TEA, 19 U.S.C. § 1862 (*supra* at 678–80); § 203 of the IEEPA, 50 U S.C. § 1702 (*supra* at 680–82); § 7(a) of the EAA, 50 U S C. app. § 2406(a) (*supra* at 683–84). It is possible, of course, that a particular situation may present a preemption question under statutory authorities other than the EPCA or the DPA.

## 2. Burden on Interstate Commerce

A separate question is whether or under what circumstances state laws, regulations, or plans may be subject to challenge under the "negative implication" of the Commerce Clause of the Constitution (Art. I, § 8, cl. 2).[162] Even in the absence of federal regulation, a state law or regulation may be unconstitutional because it creates an undue burden on interstate commerce. *See, e.g., Hughes* v. *Oklahoma,* 441 U.S. 322 (1979). However, not all state actions that regulate aspects of interstate commerce are unconstitutional. Determining the validity of particular state statutes or regulations that may affect interstate commerce requires a careful inquiry:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike* v. *Bruce Church, Inc.,* 397 U.S. 137, 142 (1970) (citation omitted).

Although this inquiry necessarily depends on the particular facts presented, as a general matter state laws or regulations that would allow a state to enhance its petroleum supply to the detriment of other states, for example, by an allocation scheme or export restriction, would have to be carefully scrutinized. The Supreme Court has repeatedly struck down, as violative of the Commerce Clause, state statutes that "mandat[e] that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power Co.* v. *New Hampshire,* 455 U.S. 331 (1982), *citing Hughes* v. *Oklahoma, supra,* 441 U.S. 322 (1979); *Pennsylvania* v. *West Virginia,* 262 U.S. 553 (1923); *West* v. *Kansas Natural Gas Co.,* 221 U.S. 229 (1911); *Philadelphia* v. *New Jersey,* 437 U.S. 617, 627 (1978). Most recently, in *Sporhase* v. *Nebraska,* 458 U.S. 941 (1982), the Court held unconstitutional a Nebraska statute conditioning export of groundwater from the state on reciprocal treatment from the receiving state.

In *Sporhase,* however, the Court also suggested that not every restriction imposed by a state on the export of its natural resources is necessarily unconstitutional. The Court noted that:

> [A] State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens— and not simply the health of its economy—is at the core of its

---

[162] "The Congress shall have the power     [t]o regulate commerce . . . among the several states."

> police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other.

458 U.S. at 956 (citation omitted). If the Nebraska statute in question had been "narrowly tailored to the conservation and preservation rationale," the Court indicated it might not have found a constitutional objection. *Id.* at 958.[163] Therefore, it may be possible that a state could constitutionally impose some restrictions on the export or allocation of petroleum products to protect the health of its citizens in times of an emergency energy shortage if the restrictions were narrowly tailored to serve legitimate state preservation and conservation purposes. Any such statutes, however, would have to be subject to "the 'strictest scrutiny' reserved for facially discriminatory legislation." *Id.*, quoting *Hughes* v. *Oklahoma, supra,* 441 U.S. at 337.

State laws or regulations that do not discriminate in favor of the state's own producers or consumers would not necessarily present the same facial constitutional objection, but may nonetheless be subject to challenge under the Commerce Clause. For example, if the regulation places unreasonable barriers to the flow of goods across state lines,[164] imposes price controls or other regulation directly on interstate transactions,[165] or poses a threat of multiple, inconsistent burdens because of similar, conflicting regulation by other states, it would be vulnerable to a constitutional challenge.[166] State measures designed to deal with energy emergencies that are strictly local in scope and effect and are clearly linked to preservation of the health and safety of the citizens of the state, would probably withstand constitutional scrutiny. A determination whether particular state laws or regulations would be vulnerable to challenge on the ground that they unconstitutionally burden interstate commerce can be made, however, only on a case-by-case basis.

## G. *Authority for Public Information Activities*

A number of federal statutes charge the Department of Energy with specific responsibility and authority to gather and publish information relevant to energy supplies and energy emergency preparedness activities. *See, e.g.,* 42 U.S.C. § 6361(b) (Secretary of Energy directed to develop a public education program to encourage energy conservation and efficiency); 15 U.S.C. §§ 772, 796 (Secre-

---

[163] The scope of this potential exception to the Court's otherwise consistent holdings that a state may not constitutionally restrict its natural resources to its own citizens might conceivably be limited by the Court to restrictions on the export or use of water In "balancing" the state's interests that might justify otherwise discriminatory legislation, the Court gave some weight to historic claims of state "ownership" of water within its borders. The Court made clear that such claims are based on a "legal fiction," but noted that they may be "more substantial than claims of public ownership of other natural resources." 458 U S at 951, 956–57. It is unclear, therefore, whether the narrow exception recognized by the Court would be extended to restrictions on other types of natural resources.

[164] *See, e.g., Hughes* v *Alexandria Scrap Corp,* 426 U S. 794, 803 (1976)

[165] *See, e.g., Public Utilities Comm'n* v *Attleboro Steam & Electric Co.,* 273 U.S 83 (1927)

[166] *See, e.g., Southern Pacific Co* v *Arizona,* 325 U.S. 761 (1945).

tary of Energy authorized to request, acquire and collect energy information);[167] 42 U.S.C. § 7135 (establishment of Energy Information Administration); 42 U.S.C. § 8511(e) (Secretary of Energy directed to publish levels of consumption for targeted energy sources under the EECA). Other public information activities may be undertaken, on a formal or informal basis, in order to carry out functions delegated to the Department of Energy by statute or executive order. *See, e.g.,* 42 U.S.C. § 7101 *et seq.;* Exec. Order No. 12,038, 3 C.F.R. 136 (1978); Exec. Order No. 11,912, *supra.*

### III. Triggers for Exercise of Statutory Authorities

Section 272(a)(3)(B) of the EPCA, as added by § 3 of the EEPA, provides that this Memorandum of Law should distinguish among three types of situations that could trigger a presidential exercise of authority to deal with a severe petroleum shortage, *viz:*

  (i)   situations involving limited or general war, international tensions that threaten national security, and other Presidentially declared emergencies;
  (ii)  events resulting in activation of the international energy program; and
  (iii) events or situations less severe than those described in clauses (i) and (ii).

As described in Part I with respect to each statutory authority, the circumstances that provide a basis for exercise of a particular authority differ from statute to statute, and in some cases, among provisions of the same statute. Many of those circumstances overlap. In any particular emergency situation facts may justify action under a number of those statutes. Consequently, the President's authority cannot be subdivided neatly into the three categories listed, and an attempt to do so with any degree of certainty is inevitably somewhat misleading. Each statute must be considered on its own terms and in light of its legislative history and the facts of a given emergency. However, in order to comply fully with the intent of § 272(a), a rough categorization of the statutory authorities discussed in Part I is provided below. This categorization is not intended in any way to modify or add to the description of those authorities in Part I.

*A. Situations Involving War, International Tensions That Threaten National Security, and Other Presidentially Declared Emergencies*

We have included, within the category of authorities that could be used in the enumerated factual situations, provisions that by their terms authorize the Presi-

---

[167] Functions originally delegated under those provisions to the Administrator of the Federal Energy Administration have been transferred to the Secretary of Energy. *See* 42 U S C § 7151(a).

dent to act in the interests of promoting the national defense and national security of the United States:[168]

> Defense Production Act, 50 U.S.C. app. §§ 2071(a) & (b), 2158, 2160
>
> Trade Expansion Act, 19 U.S.C. § 1862
>
> International Emergency Economic Powers Act, 50 U.S.C. § 1702
>
> Trading with the Enemy Act, 50 U.S.C. app. § 5
>
> Export Administration Act of 1979, 50 U.S.C. app. § 2406
>
> Outer Continental Shelf Lands Act, 43 U.S.C. § 1341(b)
>
> Magnuson Act, 50 U.S.C. § 191

## B. Events Resulting in Activation of the International Energy Program

We construe the category described as "events resulting in activation of the International Energy Program" to encompass authorities that are expressly contingent on activation of the IEP emergency system in the event of a 7 percent oil shortage, in accordance with Chapter IV of the IEP Agreement. We do not include in this category other statutory authorities that may be relevant to participation by the United States in the IEP, but that do not necessarily depend on activation of the IEP emergency system:

> Energy Policy and Conservation Act, 42 U.S.C. §§ 6271, 6272[169]

## C. Less Severe Events or Situations

Included within this category are additional provisions that authorize presidential or executive action in situations other than those necessarily involving the national defense or security, or requiring activation of the IEP emergency system:

> Energy Policy and Conservation Act, 42 U.S.C. §§ 6212, 6214, 6231–6241, 6261–6262
>
> Defense Production Act, 50 U.S.C. app. § 2071(c)
>
> Emergency Energy Conservation Act, 42 U.S.C. §§ 8501–8541
>
> Export Administration Act, 50 U.S.C. app. § 2406
>
> Powerplant and Industrial Fuel Use Act, 42 U.S.C. § 8374(b)
>
> Public Utility Regulatory Policies Act, 15 U.S.C. § 717z
>
> Federal Power Act, 16 U.S.C. §§ 824a(c), 824i, 824j
>
> Natural Gas Act, 15 U.S.C. §§ 717b, 717f
>
> Natural Gas Policy Act, 15 U.S.C. §§ 3361, 3363

---

[168] Inclusion in this category of particular statutory authorities that do not, by their terms, require a presidential declaration of a national emergency, should not be construed to suggest that any such declaration would be a prerequisite for exercise of authority under that statute, or that exercise of that authority would be subject to the NEA. *See supra* at n.78.

[169] As described *supra* at 58–59, § 252, 42 U.S.C. § 6272, and the implementing regulations, Voluntary Agreement, and Plan of Action permit limited information exchange by companies prior to activation of the IEP emergency system.

Mineral Lands Leasing Act, 30 U.S.C. § 192
Outer Continental Shelf Lands Act, 43 U.S.C. § 1341(b)
Interstate Commerce Act, 49 U.S.C. §§ 10928, 11123
Clean Air Act, 42 U.S.C. § 7410(f)
Disaster Relief Act, 42 U.S.C. §§ 5145, 5146
Foreign Assistance Act of 1961, 22 U.S.C. §§ 2346, 2357, 2393

## IV. Conclusion

In conclusion, it is important to emphasize again that the discussion in this Memorandum of the statutory authorities that may be available to the President in the event of a petroleum emergency cannot possibly be exhaustive or entirely authoritative, because the nature and extent of that authority will necessarily differ depending on the factual situation presented by an actual petroleum shortage. Many of the legal issues raised with respect to the President's authority therefore cannot be fully resolved in the abstract. Within that significant constraint, we have attempted here to discuss as fully as possible each of the statutory authorities that we believe may be relevant in a future petroleum emergency, and to address specific legal issues raised by Congress during its consideration of § 3 of the EEPA. Consistent with the terms of that section, we hereby submit this Memorandum of Law, for transmission by the President to Congress.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*